**UNITED DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **In re Kugel Mesh Hernia Patch Products Liability Litigation** | **MDL Docket No. 07-1842-ML** |
| | **JUDGE LISI** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

**DECLARATION OF BRIAN E. SCHRADER IN SUPPORT OF DEFENDANT'S OPPOSITION TO PLAINTIFF'S PROPOSED ORDER FOR PRESERVATION OF EVIDENTIARY DOCUMENTS AND CERTIOAN DISCOVERABLE MATERIALS**

I, Brian E. Schrader, declare as follows:

1. I am an attorney licensed and admitted to practice law in the State of New York. The following facts are within my personal knowledge and, if called as a witness, I could and would testify competently with respect thereto.

2. I make this declaration in support of Defendants' Opposition to Plaintiffs' Proposed Order for The Preservation of Evidentiary and Certain Discoverable Materials.

3. I am employed by Business Intelligence Associates, Inc. ("BIA"), a Computer Forensics, Electronic Discovery and Information Management consulting firm that provides a wide range of expert services, including Digital Forensics Investigations, Commercial Fraud Investigations and Analysis, Electronic Evidence Discovery and related consulting, Security Incident Response, E-Policy Consulting and Audit and Certification Services, for private industry and the government. We have been retained to assist Defendant C.R. Bard, Inc., ("C.R. Bard") and Davol, Inc. (Davol) and its counsel with the discovery process in this litigation.

4. I received my BA from the University of Illinois, Urbana-Champaign, in June 1995. I received my J.D. from New York Law School in June 1998 and have been a member in good standing of the New York State Bar since July 1999. I have over 15 years experience in the legal, computer and technology fields, and have been with BIA since November 2002. As reflected in my Curriculum Vitae, which is attached hereto as Exhibit A, in addition to a history of technological experience and training received from various institutions, I have received professional training and certification in computer forensics and have a long history of experience in the technology field.

5. I have strong analytical and investigative skills in addition to the experience necessary to professionally analyze computerized data in a forensically sound manner. I have received training in various computer systems, programming languages and a wide variety of software solutions. I also have extensive experience in custom, complex database systems, and have served as an expert witness in a variety of technology and electronic discovery related litigations.

6. I have also been involved in the instruction of federal, state and local law enforcement officials, as well as corporate IT and security personnel in digital forensics and investigations and electronic discovery, as well as having conducted computer forensic investigations of systems ranging from stand-alone computers to complex server and mainframe systems and legacy computer equipment and software systems.

7. While at first glance the Proposed Order may seem relatively routine, there are certain aspects of the order that, if implemented, would effectively require C.R. Bard and Davol to literally freeze all systems—from mobile devices and desktop computers to servers and mainframes—in their current state and would bring C.R.

Bard's business to a halt. Indeed, the effect would be to require C.R. Bard and Davol to do the equivalent of cryogenically freezing its operations. While that may not be the intent, it would be the practical result of the application of the directives contained within Plaintiffs' Proposed Order.

**8.** There are several aspects of the order that exceed any reasonable—or even feasible—standard for the preservation of data, including (1) the onerous, impractical and unnecessary demands that require preservation of volatile memory, (2) the prohibition on "purging of data" that is vague, ambiguous and incredibly burdensome, (3) the unreasonable (and rather ineffective) demands that C.R. Bard and Davol ***create and retain*** duplicate copies of every single email sent through their email systems, (4) the requirements regarding the preservation of backup tapes, and (5) the preservation of historical information regarding software programs (or software applications).

**9.** In the end, although the Proposed Order claims to do nothing more than attempt (albeit unsuccessfully) to set forth C.R. Bard's and Davol's obligations under the Federal Rules of Civil Procedure, it instead would result in crippling obligations being placed on C.R. Bard and Davol that would essentially bring daily operations to a grind halt.

**Preservation of Volatile Memory**

10. One of the most significant, onerous and ultimately meaningless requirements of the Proposed Order can be found in the second paragraph, which contains the very first directive in the Proposed Order for the preservation of Electronically Stored Information ("ESI"). Paragraph A of the Proposed Order, among other things, seeks to prevent C.R. Bard from "eras[ing] memory . . . stored in or by computer . . . relevant to plaintiff's claims. . ."

11. Significantly, the Proposed Order separately identifies and defines common storage media such as "disks, tapes or electronic files of any kind." The use of the term "memory" completely separately and apart from the other terms, as here, must be read to refer to the *volatile* memory found on nearly every computerized device, from mobile phones to complex enterprise servers and legacy mainframes.

12. The most common type of such "memory" is Random Access Memory, or as it is more popularly known, RAM. A computerized device or system, be that a modern cell phone or a legacy mainframe computer system, utilizes RAM to store information *temporarily* for quick use and access by a computer system during its normal routine operations. Think of it as creating a copy of a case from a law book and keeping that copy on your desk while returning the book to the library shelf. The purpose of the local copy is convenience and quick access. The copy of data in RAM is essentially no different.

13. RAM is a temporary storage medium that works as a canvas for the computer system.[1] It contains (a) copies of software programs being used at any particular time (i.e. Microsoft Word), as well as "working" copies of newly created information or information retrieved from another source, be that the subject computer's hard disk drive (HDD), a network storage location or an internet storage location.

14. For example, when you open Microsoft Word and start creating or modifying a document, the parts of the Microsoft Word program itself being used at that instant, along with a "working" copy of file being created, viewed or modified would be stored in RAM.

15. When a user opens a letter, for example, a "working copy" of that letter is copied into the computer's RAM for quick and efficient use. Once any changes are done, the user will be prompted to save that information to a more permanent medium. If the user decides not to save the changes, the sections of RAM used for that become free and are very quickly overwritten.

16. This is why, when a user is working on a file when a computer crashes or loses power, the changes not saved are lost, as those changes were not saved from the temporary RAM *canvas* to durable memory media such as an HDD. RAM basically loses its "memory" when the computer system at issue looses power (be that from a power loss or a routine shutdown).

---

[1] While this issue may seem complex, it's quite simple. Anyone who has purchased a computer can appreciate the value of more RAM, specifically that the more RAM in a system, the faster that system will operate. The reason for that is actually quite simple: RAM is exponentially faster than most other storage mediums. That is because RAM is a very fast, solid state (i.e. no moving parts) memory system. But, it is only used to store *working* copies of programs and information and is ***not*** used for any permanent, essential, or critical data storage.

17. Moreover, as a computer is used, the "memory" in RAM is changed constantly. Say, for example, you are writing "John called Sally" but then change that to "John quickly contacted Sally". As that change is made, the RAM is changed contemporaneously and the original is lost.

18. If a user were required to maintain "memory", it would essentially be the equivalent of requiring someone writing out a letter to make a copy of that letter each time a new word (or word a single letter or comma) is added, as each time a new word or letter is added, the document (or in the computer environment, the "memory") is changed.

19. The only way to prevent such memory from being overwritten in the normal course of business would be to freeze absolutely every single computerized device currently utilized by C.R. Bard and Davol and take extraordinary steps to preserve the instantaneous memory of each device. But it wouldn't stop there, as the Proposed Order as written would require that any work done on any electronic media be halted routinely and the memory frozen in time.

20. While that may not be the intention of the Proposed Order, it is the only way to immediately comply with such an Order.

21. Beyond the practicalities and incredible burden – a burden that would essentially freeze all work at C.R. Bard and Davol, there is no indication that such information would contain any Electronically Stored Information (ESI) that will not be obtainable through C.R. Bard's or Davol's extensive standard Enterprise ESI Collection procedures or that would even be relevant to the claims at issue.

22. Because RAM is a *temporary* memory device, most information – especially any information that was ever sent or retained—would have been stored in a much more permanent storage medium. For example, if a user were to write an email to someone using the C.R. Bard or Davol email system, that email would have been stored in that system (and in any event would no longer be present in memory). Thus, since such information would be stored on permanent media sources that will be searched, there is no reason to require that such information also be retrieved from memory (assuming of course such information would even be present).

23. The impetus of the language here likely is derived from a recent (and rather controversial) court ruling where a party was required to maintain data kept ***only*** in volatile memory. [2] There the drastic step was ordered based on substantial the evidence that the information sought was *purposefully* not retained and the ***only source*** for such information (that was extremely relevant to the case) was to be found in the temporary memory of certain internet servers. Following that ruling, language such as here regarding the retention of "memory" has been glommed onto "boiler-plate" clauses without an understanding or even the slightest consideration of the practical impact of such terms.

24. There is no indication that such temporary data would be present here, and as someone who has been involved in numerous cases with C.R. Bard and Davol, I can attest to the fact that I do not believe that any useful or meaningful data would be obtained from such sources.

---

[2] Columbia Pictures et al. v. Justin Bunneli, et al. CV 06-1093, May 29, 2007 Decision.

25. Thus, any requirement that "memory" be preserved in its current state is not only significantly onerous, but there is no indication whatsoever that such action would result in the discovery of any potentially relevant information.

**The Prohibiting on "Purging of Data" is Ambiguous**

26. Also in the first directive of the Proposed Order is a blanket prohibition on the "purge [of] data . . . relevant to plaintiffs' claims". The primary concern with this language is that there is no definition or parameters provided that would allow C.R. Bard or Davol to implement such a prohibition.

27. There are any multitude of routine activities that will take place in IT enterprises the size of C.R. Bard and Davol that could be construed to potentially violate the letter of such an order, including routine HDD defragmentation processes, routine and automatic purging of server and system logs, automatic and unpreventable purging of browser histories, firewall system logs, VPN systems and the like.

28. Beyond the fact that the halting of such activities that could potentially fall under the "purging of data" moniker would be nearly impossible to implement, those steps that might be implementable would be a significant burden on C.R. Bard and Davol.

29. For example, there is a routine process called "defragmentation" run on hard disk drives that essentially reorganizes all of the information on a particular HHD to increase the efficiency and speed of data retrieval. Think of this as having someone alphabetize a filing system. Before the alphabetization, a person might need to search every file, but after the alphabetization, the particular file at issue can be quickly and easily located.

30. Many systems automatically execute such processes, and to stop such processes at this time would require a significant burden (essentially a ***manual*** review of each system even ***potentially*** impacted), and would result in overall degradation in the performances of C.R. Bard's and Davol's computer systems across their entire enterprise.

31. As a relation back to the first issue raised above, the simple act of turning off or restarting a computer system or opening a new file generally will result in a purge of all data stored in RAM. As such, any of these simple acts could be seen as violating the terms of the Proposed Order.

32. Thus, the current usage of the term "purge data" in the Proposed Order is not only unclear, but because of that lack of clarity or definition, the practical implication of such a requirement would be result in an impossible task.

**Email Backup Tape Preservation**

33. Section 1(A) appears to allow for the reuse of backup tapes in their normal cycle, but in fact, requires exactly the opposite, or alternatively, a whole new system to be implemented to maintain full backups as information changes over time.

34. The requirement that "full back-up tapes . . . [be] retained for all e-mail services worldwide which are cumulative of changes over time" presents a significant burden on plaintiffs.

35. Both C.R. Bard and Davol have taken steps to meet their preservation requirements in a manner that is reasonable and designed to ensure that all potentially responsive documents are preserved. The language here essentially requires that C.R.

Bard and Davol go above and beyond that obligation and create a separate and distinct system for the preservation of email.

36. The general idea of a tape backup system is to preserve data as it exists on a particular system as well as changes to that data over time.

37. What this section requires is that C.R. Bard and Davol need not keep copies of their tapes, as long as they are keeping copies of their backup tapes. The inherent conflict in the statement alone is clear.

38. Instead of such an onerous policy, both C.R. Bard and Davol have taken steps to preserve certain tapes during its backup process in a manner that will meet what is likely the apparent goal of this section, assuming of course, that there comes a time at which significant enough justification is present that justifies the expense of reviewing and retrieving that data.

**Journaling of Email is Unnecessary**

39. In Section A(1)(b) of the Proposed Order, plaintiffs seek to prevent C.R. Bard or Davol from deleting any email whatsoever unless the activities of the users are "journaled." Plaintiffs admit that such "Journaling" would require that ***every*** email sent or received through C.R. Bard's or Davol's email systems be retained indefinitely.

40. Such a demand is so broad and burdensome on its face as to require little comment except to point out that the practical implication of such a requirement would be to prevent C.R. Bard and Davol and their employees from deleting any email going forward whatsoever, regardless of relation to this case. In fact, it even would require C.R. Bard to cease any automatic purging of virus infected emails or SPAM.

41. The much more common and practical approach – as practiced in litigation for decades – is to provide notice to all potentially relevant custodians that they are to retain their emails (and other documents, files, etc.). That retention notice can be specific or general, but in any event, is the protocol set forth in every ESI collection guideline and has been codified by the recent changes to the Federal Rules of Civil Procedure designed specifically to address such issues.

**<u>Network/Home Directory or Other Backup Tape Retention</u>**

42. Similarly to the issues with email, plaintiffs seek to essentially require C.R. Bard and Davol to retain copies of all backup tapes made over time.

43. Again, the Proposed Order appears to allow routine recycling of backup tapes created for the purpose of disaster recovery, but then goes on to say that such recycling is only allowed when "full back-up tapes for the Network/Shared File Home Directories are being retained."

44. As before, the conditions imposed essentially require a duplicate of all such tapes to be retained. It's simply counter-intuitive to allow for the recycling of tapes as long as the tapes are retained historically. In the end, the demand is self-conflicting and meaningless except to substantially increase the burden on C.R. Bard and Davol.

45. Section 3(b) requires that the Defendants not modify any of the software programs used without retaining the former versions of such programs. Again, while that may seem simple, given the broad language, the practical application is, in fact, impossible. In practical application the Proposed Order as written would prevent C.R.

Bard or Davol from installing ***any*** updates, new versions or other modifications of any programs whatsoever.

46. For example, the language of the Proposed Order would prevent C.R. Bard or Davol from allowing automatic updates to commercial software programs that are routinely updated often on a daily or weekly basis (e.g. Microsoft Word, Norton Antivirus, Internet Explorer, etc.).

47. The Proposed Order allows "[c]hanging applications as required to conduct business . . ." as long as all such changes are logged and the original versions maintained. So, in order for C.R. Bard or Davol to allow the virus definitions of Norton Antivirus to be updated each day, they would have to take some unspecified step – ***create information and records*** – to record such "changes to the application and [maintain] copies of source and object code for all versions of the applications."

48. As a preliminary matter, it is impossible under the license agreement for nearly every single commercial software for the user to maintain source and object code of such software. Yet more significantly, commercial software vendors simply do not make such information available to the end user as to make compliance with such requirements even possible.

49. The practical effect of Section A(3)(b) is to prevent C.R. Bard or Davol from upgrading, patching or otherwise maintaining ***any*** software installed on ***any*** computerized device throughout the entire enterprise.

50. Again, while that may not have been the intent of the language in the Proposed Order, it is another example of how the proposed language has been written

in such a way as to be so broad that it becomes open to nearly any interpretation and essentially meaningless.

**Conclusion**

51. Overall, the language of the Proposed Order, while at first glance seemingly reasonable, in application quickly becomes so burdensome as to significantly and adversely impact the ability of C.R. Bard and Davol to continue in their normal course of business.

52. The Proposed Order seems to attempt to restate the obligations placed on parties under the Federal Rules of Procedure and recent case law; however, the actual language of the Proposed Order, when taken to the logical conclusion, clearly and significantly exceeds any such obligations.

Dated: February 15, 2008
New York, NY

Brian E. Schrader

**Exhibit A to Declaration of Brian E. Schrader, Esq.**

# Brian E. Schrader, Esq.

**BIA**
39 Broadway, 26th Floor
New York, NY 10006
212-240-2282
http://www.biaprotect.com

Business Intelligence Associates, Inc. (BIA) creates and implements solutions that help ease the way through complicated legal and technical issues, from the initial collection of digital evidence to the full analysis of that digital information. BIA offers a wide range of services, including ESI Collections and Management, Digital Forensics Investigations, Electronic Discovery Services, Commercial Fraud Investigations and Analysis, Electronic Policy Consulting and Audit/Certification Services for private industry and the government. BIA has offices in New York, California and Washington as well as responders worldwide.

## Education:

University of Illinois, Urbana-Champaign
New York Law School, Juris Doctor
Moot Court Association (Vice Chair & Scholarship)
Order of the Barristers; NYLS Journal of Human Rights, Vol. XIII, Part Four

## Bar Admissions:

New York Bar
U.S. District Court, Southern & Eastern Districts of New York

## Membership:

American Bar Association
New York Bar Association
New York County Lawyers Association
Association of Certified Fraud Examiners

## Relevant Experience:

1990 **Schrader Computer Consulting** (Principal)
1996 **Justice Charles Ramos**, New York Supreme Court, Comm. Div. (Intern)
1996 **Folkenflik & McGerity** (Legal Assistant)
1998 **New York Stock Exchange**, Enforcement Division (Intern)
1998 **Folkenflik & McGerity** (Associate)
1999 **Cabina, LLC** (Managing Member)
2002 **Business Intelligence Associates, Inc.** (President)

Brian Schrader, both a technologist and attorney, was a member of the founding team at BIA, which at the time was created in order to fill a gap in the growing electronic

discovery and network forensics market. Today BIA assists corporations and attorneys in the fields of compliance, data management and electronic discovery for complex litigation and acts as a lead forensic responder to several Fortune 1000 companies.

**Representative Matters:**

***Electronic Discovery***

Lead expert in commercial litigation related to complex insurance agreements. Involved analysis regarding alleged fraud and failure to compensate parties as agreed pursuant to contractual agreement. Involved onsite extraction of data from large insurance related custom enterprise database system, reconstruction of that database system using extracted data and significant analysis to determine damages and recover factual entries relevant to claims in litigation. Worked with accounting experts to analyze said data for damage calculations.

Lead expert in several cases against multiple defendants arising out of the collapse of Lernout & Hauspie following the revelation of massive accounting fraud at the company. Oversaw restoration and analysis of large amounts of backup tapes and analysis of data retrieved. Worked with attorneys to develop and implement comprehensive electronic discovery plans and assisted attorneys with various disputes regarding form and content of electronic data produced.

Associate role in various massive securities fraud arbitrations and against numerous individuals and entities including among others, D.H. Blair & Co., Inc. A.R. Baron & Co., Inc. and Bear Stearns & Co., Inc. Worked with experts to rebuild a large trading database and analyze millions of trading records for all trades in a ten-year period for the brokerage house. Created various reports and analysis of that data for use in arbitration proceedings.

Lead legal expert in class action lawsuit by limited partners in a Real Estate Investment Trust against general partner. Assisted in the collection and analysis of data received from third party. Formulated plans and requests for electronic discovery proceedings.

Lead legal expert for consumer class action lawsuit against American Express. Worked with client to identify issues necessary to successfully intercede in related but separate class action settlement, identify and pursue electronic and related discovery to develop full understanding of credit card processing systems.

Lead legal expert for franchisee class action law suit against major real estate corporation, Cendant, Inc. Worked with client to develop overall electronic discovery plan, deposition notices, interrogatories and discovery requests. Assisted client in identifying financial systems and other electronic data relevant to the underlying claims.

***Digital Forensic Examinations***

Lead investigator for a governmental regulatory investigation of an insurance company for potential violations of insurance regulations and other applicable laws and regulations. Extensive background research and information gathering with respect to target company, development and execution of examination plan including demands for documents and information, onsite interviews and reporting functions.

Co-lead examiner for major pharmaceutical diversion and counterfeit investigation, in cooperation with Los Angeles County Sheriffs Office and the Federal Food and Drug Administration. The investigation

included hundreds of gigabytes of digital evidence and thousands of pages of paper evidence requiring manual inspection of data at hex levels using forensic techniques and deep knowledge of file systems.

Lead examiner and legal consultant for investigation of staff of large national law firm suspected of fraudulent activities involving expense accounts and submission of falsified expense reports and vendor invoices.

Lead examiner for recovery investigation of digital asset of partner of large national partnership for various pending internal and external investigations.

## Legal & Technical Background

Represented clients in a variety of commercial litigations, securities fraud litigations and arbitrations, commercial transactions and other commercial and personal litigations and related proceedings. Appeared as counsel before both state and federal courts and arbitration and regulatory panels of the NASD-Regulation, Inc., the New York Stock Exchange and the American Arbitration Association. Experience in all facets of litigation from drafting complaints, answers, motion papers, document requests, interrogatories and the like, to oral arguments, depositions and appellate arguments.

Prior to tenure at Folkenflik & McGerity, worked under Justice Charles Ramos of the New York State Supreme Court, Commercial Division and also worked for the New York Stock Exchange, Enforcement Division. Experience with Justice Ramose included drafting opinions and establishing a first-hand understanding of the behind-the-scenes workings of the judicial system. Worked primarily on discovery related issues such as document requests, interrogatories and witness examinations, as well as various legal research assignments with the New York Stock Exchange, Enforcement Division.

Extensive history and excellent understanding of technology and its application, both with respect to systems and processes in use throughout businesses, as well as an expert with respect to many of the solutions available to legal practitioners. Experience with programming, database administration, applications and systems processing.

Co-founded Cabina, LLC, a legal and technology research company that was tasked with designing detailed specifications and proposals for complex litigation discovery processes and procedures, including activities related to the parties, the documents and the courts. The company was fortunate to have a reputable board of advisors including well-known and respected names in the legal and technology fields. Cabina, LLC was eventually folded into Business Intelligence Associates, Inc. within a few years of its founding in order to implement some of its groundbreaking designs and methodologies.

**Technical & Analysis Skills:**

Most Microsoft systems and applications, as well as many other office suites and business applications. Financial systems and advanced database analysis; SQL and general relational database systems. Various legal administrative and litigation support systems including Summation (including iBlaze, WebBlaze and CaseVault), Concordance, iManage, Lextranet, Case Central, Case Share, Litigator's Notebook, Documentum, Livenote, LexisNexis, Westlaw, and many more.

**Expert Witness Trial Testimony:**

*Potomac Group West v. The BISYS Group, Inc.*
Circuit Court, Montgomery County, Bethesda, Maryland

*Zisholtz v. DiGiacomo*
Supreme Court, Kings County, Brooklyn, New York