**UNITED DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| **In re Kugel Mesh Hernia Patch Products Liability Litigation** | **MDL Docket No. 07-1842-ML** |
| | **JUDGE LISI** |
| **THIS DOCUMENT RELATES TO: ALL ACTIONS** | |

# DECLARATION OF BRIAN E. SCHRADER IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' PROPOSED ORDER DETAILING THE FORM AND FORMAT OF DOCUMENTS TO BE PRODUCED

I, Brian E. Schrader, declare as follows:

1. I am an attorney licensed and admitted to practice law in the State of New York. The following facts are within my personal knowledge and, if called as a witness, I could and would testify competently with respect thereto.

2. I am employed by Business Intelligence Associates, Inc. ("BIA"), a Computer Forensics, Electronic Discovery and Information Management consulting firm that provides a wide range of expert services, including Digital Forensics Investigations, Commercial Fraud Investigations and Analysis, Electronic Evidence Discovery and related consulting, Security Incident Response, E-Policy Consulting and Audit and Certification Services, for private industry and the government. We have been retained to assist Defendants C.R. Bard, Inc., ("C.R. Bard") and Davol, Inc. (Davol) and their counsel with the discovery process in this litigation.

3. I received my BA from the University of Illinois, Urbana-Champaign, in June 1995. I received my J.D. from New York Law School in June 1998 and have been

a member in good standing of the New York State Bar since July 1999. I have over 15 years experience in the legal, computer and technology fields, and have been with BIA since November 2002. As reflected in my Curriculum Vitae, which is attached hereto as Exhibit A, in addition to a history of technological experience and training received from various institutions, I have received professional training and certification in computer forensics and have a long history of experience in the technology field.

4. I have strong analytical and investigative skills in addition to the experience necessary to professionally analyze computerized data in a forensically sound manner. I have received training in various computer systems, programming languages and a wide variety of software solutions. I also have extensive experience in custom, complex database systems, and have served as an expert witness in a variety of technology and electronic discovery related litigations.

5. I have also been involved in the instruction of federal, state and local law enforcement officials, as well as corporate IT and security personnel in digital forensics and investigations and electronic discovery, as well as having conducted computer forensic investigations of systems ranging from stand-alone computers to complex server and mainframe systems and legacy computer equipment and software systems.

6. I have reviewed Plaintiffs' Memorandum in Support of Plaintiffs' Motion for the Entry of an Order Detailing the Form and Format of Documents to Be Produced, including the Exhibits attached thereto. I write this Declaration in support of Defendants' Opposition to that motion.

7. There are two primary areas of concern with respect to Plaintiffs' Proposed Order. First, the Proposed Order contains onerous and extremely

burdensome search demands that will significantly increase the costs and burden of Defendants' document review and production process. Second, the definition of metadata includes items that are not metadata, but instead, are attorney work product, that to the extent such data even exists, would have been created at the direction of counsel and solely for Defendants' and Defendants' counsel's use in this litigation.

**The Search Terms as Presented Are Burdensome**

8. Through the Proposed Order, Plaintiffs seek to impose a substantial burden on Defendants by demanding that Defendants' utilize a list of 18,158 search terms. Not only would the use of such an expansive list of terms be overly burdensome and time consuming, but Plaintiffs' expert's sample sets fail to take into account real world applications of their proposed search terms and do not adequately account for the actual time it would take to prepare and execute such a search.

9. First, in the many years that I have been involved in commercial litigations, both as an attorney and as an ESI expert, I have not encountered such an extensive list of nearly 400 pages containing over 18,000 search terms. Thus, I can state with certainty that it is not the customary, normal or accepted practice to allow for such a broad, burdensome and extensive search.

10. Second, there is a fundamental logic flaw in Plaintiffs' experts' use of the documents already produced in an attempt to identify potentially effective search parameters in that the analysis was done on a "stacked deck" of documents already deemed responsive. Since the analysis was not done on a set of data that takes into account the real world parameters, the conclusions are meaningless. The analysis

completely disregards the potential for such terms to result in documents that are wholly irrelevant to the issues present in this case. Of course the search parameters were going to result in meaningful hits in the sample set utilized by Plaintiffs, since each of those documents were already deemed responsive.

11. Essentially, since all of the documents in Plaintiffs' sample set were already deemed to have been responsive, they could have searched for *anything* to support a claim that had a particular "new" search term not been included the document would not have been produced, ***but for the fact*** that another term was included in the document. This is a clearly circular argument that has little actual relevance when applied against a real world, non-culled data set.

12. Given that Plaintiffs' list of search terms is over 2000 times larger than that used by Defendants during the initial document review and production, the potential for such terms to result in the identification of clearly irrelevant documents is likewise exponentially increased, which in turn substantially increases the costs involved in the review of all of the documents identified by the proposed search criteria.

13. Furthermore, Plaintiffs' estimate of the time it would take to run their proposed searches disregards (a) the impact of such a search if applied to all Defendants' computer systems, (b) the time it will take Defendants' experts to modify and prepare that search, (b) the number of documents that will actually be searched, and (c) the nature of the files searched. Once those factors are included, the time, effort and expense required to execute such a search would clearly impose a significant cost and burden on Defendants.

14. One of the most significant factors that Plaintiff and Plaintiffs' experts ignore in both the motion papers and in the supporting Affidavit of Suzanne Smith is the crippling impact of conducting such a search on all of Defendants' digital storage media across their entire enterprise without any reasonable limits or other such considerations.

15. Plaintiffs' conducted their search on segregated computer systems and on an extremely small set of pristine text files. There is a substantial difference between that controlled and limited process and the process required to run such expansive searches on every digital storage resource within Defendants' enterprise systems.

16. Whether Defendants' were to utilize a "live" or "indexed" search, the impact to Defendants' business would be substantial. The process of indexing or live searching even a single media source is a time consuming and processor intensive task that significantly impacts the performance of an individual computer system, often hindering that system in its ability to perform other tasks during that process.

17. Multiply that effect by the thousands of computers and digital media resources within Defendants' dispersed environments and it is quite clear that such an expansive search would place an extreme burden on Defendants, would impact their business and would cripple their computer systems during that process.

18. Moreover, the necessity of such a blanket search has not been established, and any demand to search computer systems without any determination of potential relevance of each such system is simply absurd in organizations as large, diverse and geographically dispersed as Defendants'. There is no discussion, consideration or contemplation of any kind by Plaintiffs of establishing any reasonable guidelines for the application of the admitted expansive search they proposed. Clearly

there are entire divisions, departments and other such sectors of Defendants' businesses that are wholly irrelevant to any claim at issue here. Without any focus, Plaintiffs' demands for searching Defendants' computer systems inherently lack any reasonableness or sound judgment and completely fail to take into account the impact of such searches in the real world scenarios.

19. Another significant factor omitted from the motion papers was time and expense incurred in the preparation of Plaintiffs' list. Yet, even without the disclosure of such information, it can clearly be seen from the detail provided in Plaintiffs' own papers that such effort was clearly a substantial and time consuming process. That alone shows that the effort that would be required by Defendants to apply that list to a full data set would be extremely burdensome.

20. Before any search is even run, Defendants will have to expend significant time and effort to modify and adjust that list in order to be able to put such an expansive list of search terms into practical use on a data set the size at issue here. For example, most search engines have some limitation on the number of different search terms and/or characters that can be simultaneously submitted to the search system. Additionally, the format of the search terms does not follow the format required by the search system that will be utilized here, so many of the 18,000 search terms will need to be modified to fit the syntax of the system used. Given the magnitude of the proposed search, there are likely additional issues that will only arise once an attempt is made to execute that search.

21. It is impossible to accurately predict the effort required to do such modifications without actually attempting a search of such magnitude, but based on my

experience, just reformatting, testing, altering and modifying the search, splitting the search up into smaller, more manageable sections, and running those searches in multiple parts and across every digital storage median in Defendants' enterprise and then combining the results of such searches into a coherent and unified set will likely take months of dedicated technician time, and quite potentially significantly more than that.

22. Indeed, until we are well into the process, it is impossible to predict exactly what modifications, divisions and other steps will be required to successfully conduct a search of such magnitude, and thus, exactly what the time involved will be.

23. Yet, that is not the most significant aspect that is not taken into account by Plaintiffs' and Plaintiffs' experts with respect to the time it will take to complete the search as presented. The sample run by Plaintiffs' experts was on a culled down set of only 34,424 documents. As anyone who has conducted a large scale document production knows, the initial set of documents collected is exponentially larger than that ultimately produced (most documents naturally will be irrelevant to a particular issue and generally only a small subset is actually even *potentially* relevant to the claims at issue in a given case).

24. The final number of documents impacted by such a broad based search across both Defendants' enterprises has yet to be determined, but the ultimate number could easily be hundreds or even thousands of times as large as the sample set utilized by Plaintiffs in their rather limited analysis.

25. Using Plaintiffs' assumptions and statistics, when the time figures provided by Plaintiffs are applied to the actual pool of documents collected, the overall time for

searching becomes quite large and clearly burdensome. Plaintiffs' 8 to 15 minute time estimates, when applied to a set hundreds or thousands of times larger, turns into weeks or months or running such expansive search processes.

26. That does not account, of course, for all of the other time and effort that will be undertaken in this effort. It ignores the time it will take to index the files to begin with (indexing native files like Word, Excel and other more complex file types takes significantly longer than indexing the simple ASCII text files used in Plaintiffs' examples). It disregards the efforts that will be required to actually implement a search list as extensive as that proposed by Plaintiff across the thousands of digital storage media implicated by that broad based search. Further, it does not take into account the time required in deconstruction and splitting up of the proposed list so as to even enable the application of such an extensive list. It also does not factor in the time required to analyze and adjust the search as may be needed when run on a sample set as large as the overall set here.

27. Additionally, it does not take into account the fact that the search is so cumbersome that it will likely require multiple passes to complete a search of that magnitude against a much larger collection of documents than that in Plaintiffs' sample set. When taken in the real-world context then, it becomes clear that the searching alone will likely require weeks of both manual and automated work to fully implement, and that's all before the review of documents can even begin.

28. Indeed, when the seemingly minor timing statistics provided by Plaintiffs are examined in the full light of that amount of time actually required by the overall set of

data that must be searched, the true nature of the unreasonable complexity and burden of such a search demand becomes clear.

**<u>Plaintiffs' Metadata Request is Improper</u>**

29. First, there is a preliminary distinction that should be made clear in any discussion of fielded data to be included in a discovery production. While Plaintiffs' seem to be referring solely to Electronically Stored Information (ESI), there is no distinction made between that and scanned paper documents that may be produced in TIFF format. With respect to scanned versions of paper documents (scans are essentially digital copies of paper documents), there exists no *metadata* regarding such documents. Thus, it should be made clear that in the discussion of production of documents (be that ESI or paper documents), any discussion of metadata fields must be limited solely to ESI.

30. Second, Plaintiffs' blanket use of the term "metadata" is incorrect in that it includes several fields that (a) are not metadata fields at all but are fields that would require ***subjective*** determinations be made on a particular document (referred to as "Coded" fields because those fields are manually coded and data entered by review staff during document review), (b) would require Defendants to take steps to ***create*** that information, and/or (c) seek to require the disclosure of attorney work product information.

31. A proper definition of "metadata" in the context of ESI is that information which can be extracted from the file itself, such as author, date, to, from, filename, etc.

*Coded* information, on the other hand, is that type of information requiring the document review person to create that information based on their review of the document.

32. Here, there are several fields that require such Coded information, including the "Foreign Language" field that requires a determination as to whether a document contains any foreign languages and the "Complete or Incomplete Doc" field that requires a reviewer to *subjectively* determine whether a document is complete or incomplete. Such coded fields require work to be done at the direction of or by counsel, and thus, is generally considered attorney work-product information not subject to production. Clearly the reference to such fields as "metadata" is inappropriate.

33. On a related note, with respect to the proposed "metadata" fields listed in Paragraph 6 and its subsections of the Affidavit of Robert B. Guinaugh, not all of the fields discussed by Mr. Guinaugh are requested by Plaintiffs in the Proposed Order (and there some fields he does not mention that are included in the Proposed Order). I address below only of those fields included in the Proposed Order. However, among the fields mentioned by Mr. Guinaugh are many that fall into the same or similar objectionable categories as those discussed below.

34. While certain of the fields listed are at times produced in litigation (depending largely on the agreement of counsel or other direction), many of the fields listed are not true metadata fields. Metadata is generally understood to be that information that can be extracted from an electronic document itself without additional computations or subjective analysis required. There are several fields in the Proposed Order that are not true metadata, but instead, are essentially attorney work-product or similar types of information, including the following:

a. The "Foreign Language" field is not a field that is not generally determined solely through the extraction of some metadata from a document, but instead, is generated – if it is generated at all – by document reviewers as the review documents. To the extent such information may even exist in a given litigation, it would be the result of attorney work product.

b. The field "Complete or Incomplete Doc" is not only undefined, but were it to exist, would again be the type of ***subjective*** information that would be ***created by or at the direction of counsel***, and thus, clearly be attorney work product information.

c. The field "Marginalia" is one of the most classic examples of ***coded information created by or at the direction of counsel*** and thus would be attorney work product.

d. The "Redacted" field as requested is something that is usually handled through the production of a Privilege Log, and not generally included as a separate "metadata" field. Again, since such information is not extracted from the file itself, and thus, the use of the term "metadata" is not generally appropriate in that context.

35. Finally, "Document Title" and "Author Name" fields are generally unreliable metadata fields that quite often do not reflect the realities of a particular document. For example, the "Author" field of a Microsoft Word, Excel or other such MS Office document is regularly pulled from a pre-defined source such as the "name" of the

computer or the name of the user that had been using the computer at the time the program was installed.

36. Likewise, the "Document Title" field generally is automatically populated by Microsoft Word using the first few characters of the first typed line (and if that line changes, the title will not change). Thus, both items of metadata are often unreliable and provide information that does not reflect the reality of that particular document.

37. In fact, those particular fields are so unreliable, that we have worked with parties on other cases that have chosen to manually code those fields (even for electronic documents) in order to clarify those ambiguities. If those fields were reliable, such expense and effort would not be necessary.

**Native Document Production versus TIFF Format**

38. While native file productions have started to occur in some litigations, it has been my experience that the complications of such productions usually outweigh any benefits of such productions. The complications that accompany such productions and the general inability of parties to deal with native files in subsequent proceedings far outweigh any advantages that might be gained from blanket productions of all electronic files in their native formats.

39. Not only can native productions lead to substantial issues with respect to the integrity of the electronic files, but most parties are left perplexed by how to handle and refer to native files during various proceedings, leading to unnecessary confusion and complications. Indeed, with rare exception, most native files will provide little information of relevance as opposed to the "static" TIFF or PDF versions of those files

whereas the creation of "static" TIFF or PDF versions of electronic documents not only act to preserve the integrity of those documents, but are also by far the standard with which everyone is most comfortable and familiar.

40. The most traditional course in litigation by far remains the conversion of native files into a stable version, usually a TIFF or PDF file that is essentially a snapshot of the file at issue. Most relevant metadata (such as document dates, etc.) can be seen on the face of those documents or provided along with those files so that such information is available and usable without need for the native format. This quite common and routine practice remains the normal procedure in most cases and avoids the various issues that can arise from the production of native files.

41. Once such problem with native file production is that the native version of an electronic file is actually quite fragile in nature and very easily (and unintentionally) can be altered by simply viewing or copying the file from one source to another. Indeed, the simple act of copying a file from one source to another will generally result in the altering of the file's dates. Clearly, this can lead to evidentiary complications at every turn throughout the litigation.

42. With native productions, there is also the added complexity of properly authenticating the evidentiary integrity of each native file when utilized in depositions, at trial or in other such uses. Because a native file can so easily and unintentionally be altered, steps must be taken at each presentation of such a file to verify the evidentiary integrity of that file. Usually that would require that the file at issue be subjected to a

hash algorithm process[1], and the resultant value be compared to the original value calculated at time of collection or production. That process can be cumbersome at best, requires additional training and knowledge on behalf of all persons involved, and can introduce substantial complications for depositions, attachments to pleadings, evidentiary hearings and trials.

43. Another complication presented by native file productions is that the traditional use of Bates numbers is no longer useful or even available during depositions, trial or other such proceedings. While a unique value functionally similar to a Bates number can be assigned to a particular document, there is no reliable page reference designation available. Where with TIFF or PDF productions, each page is stamped with a unique Bates number, that is simply not an option in native files, as there is not uniformity to pages across all document formats.

44. While some documents will print out identically each time (such as a TIFF or PDF file would – hence the popularity of those formats in legal proceedings), when going from one computer to another or from one printer to another, the formatting and page separations can change when printing or displaying a native file, and thus, even if one were to refer to Page 243 of document ABC0002234, when that document is printed or displayed later on a different system, that page reference may no longer make sense and could be inaccurate.

---

[1] A Hash Value is essentially a digital fingerprint of a file. There are a number of accepted hash algorithms that can be used to create a hash value, with two of the more popular being MD5 and SHA-1. Essentially a hash algorithm program will examine an electronic file on a bit-by-bit level and calculate a unique alphanumeric value for that file. To verify that the file has not been altered, that algorithm program is run again at a later date and the hash value then created compared to that of the original value. If the two values match, then the integrity of the file is established. Simply adding an innocuous space character to a document will cause the hash algorithms to vary wildly.

45. I have found that such complications are rarely discussed or even contemplated at the outset of a particular case, but instead are seen much later during the actual use of the documents during subsequent proceedings, leading to endless confusion and complications.

46. In the end, the most common agreement seen among parties today is that, if a native file is deemed necessary (either by agreement of parties or by the court), then the specific file at issue may be subject to supplemental production in the native form so that the native version may be examined. However, given that adequate steps can be taken during production to display items like tracked changes, hidden notes and the like, it is generally the very rare instance where native files of documents are even needed.

47. In the end, while it may seem to be more advantageous at first glance to produce documents in their native form, the simple fact is that such productions generally lead to evidentiary integrity concerns, general confusion, complexities and complications with subsequent handling, submission and references, and unnecessary impediments to future proceedings.

Dated: February 21, 2008
New York, NY

Brian E. Schrader

**Exhibit A to Declaration of Brian E. Schrader, Esq.**

**Brian E. Schrader, Esq.**
BIA
39 Broadway, 26th Floor
New York, NY 10006
212-240-2282
http://www.biaprotect.com

BIA creates and implements solutions that help ease the way through complicated legal and technical issues, from the initial collection of digital evidence to the full analysis of that digital information. BIA offers a wide range of services, including Digital Forensics Investigations, Commercial Fraud Investigations and Analysis, Electronic Evidence Discovery, Security Incident Response, E-Policy Consulting and Audit and Certification Services, for private industry and the government. BIA has offices in New York City, New York and in the Tampa Bay Area, Florida.

**Education:**
University of Illinois, Urbana-Champaign
New York Law School, Juris Doctor
- Moot Court Association (Vice Chair & Scholarship)
- Order of the Barristers
- NYLS Journal of Human Rights, Vol. XIII, Part Four

**Bar Admissions:**
New York Bar
U.S. District Court, Southern & Eastern Districts of New York

**Membership:**
American Bar Association
New York Bar Association
New York County Lawyers Association

**Experience:**
1990 Schrader Computer Consulting (Principal)
1996 Justice Charles Ramos, New York Supreme Court, Commercial Division (Intern)
1996 Folkenflik & McGerity (Legal Assistant)
1998 New York Stock Exchange, Enforcement Division (Intern)
1998 Folkenflik & McGerity (Associate)
1999 Cabina, LLC (Managing Member)
2002 Business Intelligence Associates, Inc. (President)

Brian Schrader has many years of experience both in computer related technologies and in the law. Mr. Schrader founded BIA together with his two partners after working

for seven years in securities law, corporate and complex litigations. Mr. Schrader currently leads the Electronic Discovery and Litigation Support Group at BIA.

**Representative Matters:**

**Electronic Discovery**
Lead expert in several cases against multiple defendants arising out of the collapse of Lernout & Hauspie following the revelation of massive accounting fraud at the company. Oversaw restoration and analysis of large amounts of backup tapes and analysis of data retrieved. Worked with attorneys to develop and implement comprehensive electronic discovery plans and assisted attorneys with various disputes regarding form and content of electronic data produced.

Associate role in various massive securities fraud arbitrations and against numerous individuals and entities including among others, D.H. Blair & Co., Inc. A.R. Baron & Co., Inc. and Bear Stearns & Co., Inc. Worked with experts to rebuild a large trading database and analyze millions of trading records for all trades in a ten-year period for the brokerage house. Created various reports and analysis of that data for use in arbitration proceedings.

Lead legal expert in class action lawsuit by limited partners in a Real Estate Investment Trust against general partner. Assisted in the collection and analysis of data received from third party. Formulated plans and requests for electronic discovery proceedings.

Lead legal expert for class action lawsuit against American Express. Worked with client to identify issues necessary to successfully intercede in related but separate class action settlement, identify and pursue electronic and related discovery to develop full understanding of credit card processing systems.

Lead legal expert for franchisee class action law suit against major real estate corporation, Cendant, Inc. Worked with client to develop overall electronic discovery plan, deposition notices, interrogatories and discovery requests. Assisted client in identifying financial systems and other electronic data relevant to the underlying claims.

**Digital Forensic Examinations**
Lead investigator for a governmental regulatory investigation of an insurance company for potential violations of insurance regulations and other applicable laws and regulations. Extensive background research and information gathering with respect to target company, development and execution of examination plan including demands for documents and information, onsite interviews and reporting functions.

Co-lead examiner for major pharmaceutical diversion and counterfeit investigation, in cooperation with Los Angeles County Sheriffs Office and the Federal Food and Drug Administration. The investigation included hundreds of gigabytes of digital evidence and thousands of pages of paper evidence requiring manual inspection of data at hex levels using forensic techniques and deep knowledge of file systems.

Lead examiner and legal consultant for investigation of staff of large national law firm suspected of fraudulent activities involving expense accounts and submission of falsified expense reports and vendor invoices.

Lead examiner for recovery investigation of digital asset of partner of large national partnership for various pending internal and external investigations.

**Legal & Technical Background**

Represented clients in a variety of commercial litigations, securities fraud litigations and arbitrations, commercial transactions and other commercial and personal litigations and related proceedings. Appeared as counsel before both state and federal courts and arbitration and regulatory panels of the NASD-Regulation, Inc., the New York Stock Exchange and the American Arbitration Association. Experience in all facets of litigation from drafting complaints, answers, motion papers, document requests, interrogatories and the like, to oral arguments, depositions and appellate arguments.

Prior to tenure at Folkenflik & McGerity, worked under Justice Charles Ramos of the New York State Supreme Court, Commercial Division and also worked for the New York Stock Exchange, Enforcement Division. Experience with Justice Ramose included drafting opinions and establishing a first-hand understanding of the behind-the-scenes workings of the judicial system. Worked primarily on discovery related issues such as document requests, interrogatories and witness examinations, as well as various legal research assignments with the New York Stock Exchange, Enforcement Division.

Extensive history and excellent understanding of technology and its application, both with respect to systems and processes in use throughout businesses, as well as an expert with respect to many of the solutions available to legal practitioners. Experience with programming, database administration, applications and systems processing.

Co-founded Cabina, LLC, a legal and technology research company that was tasked with designing detailed specifications and proposals for complex litigation discovery processes and procedures, including activities related to the parties, the documents and the courts. The company was fortunate to have a reputable board of advisors including well-known and respected names in the legal and technology fields. Cabina, LLC was eventually folded into Business Intelligence Associates, Inc. within a few years of its founding in order to implement some of its groundbreaking designs and methodologies.

**Technical & Analysis Skills:**

Most Microsoft systems and applications, as well as many other office suites and business applications. Financial systems and advanced database analysis; SQL and general relational database systems. Various legal administrative and litigation support systems including Summation (including iBlaze, WebBlaze and CaseVault), Concordance, iManage, Lextranet, Case Central, Case Share, Litigator's Notebook, Documentum, Livenote, LexisNexis, Westlaw, and many more.