IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

**************** MDL NO. 07-MD-1842ML
*
IN RE: KUGEL MESH HERNIA *
PATCH PRODUCTS * OCTOBER 30, 2007
LIABILITY LITIGATION * 2:00 P.M.
*
**************** PROVIDENCE, RI

BEFORE THE HONORABLE MARY M. LISI,
CHIEF JUDGE
(Chambers Conference)

Court Reporter: Karen M. Wischnowsky, RPR-RMR-CRR
One Exchange Terrace
Providence, RI 02903
(401) 351-8311





30 OCTOBER 2007 -- 2:00 P.M.

(In Chambers)

THE COURT: Let's start off with the question of whether or not a consolidated class action complaint will be filed. Let me start with Mr. Migliori on that and ask whether you've discussed this with the Bard attorneys.

MR. MIGLIORI: First of all, good afternoon. Thank you. We have spoken about class action complaints. We actually think that this is one of the few areas that we probably have pretty close agreement that we can come up with a process for the class action litigation.

We'd like to be able to formulate a class complaint in the next 60 to 90 days and have that ready for the Court.

THE COURT: Can you tell me sort of en gross what you had in mind in terms of what class or subclasses you're thinking about as you put this thing together.

MR. MIGLIORI: I think that there are, and Teresa Toriseva, who is also lead counsel, can correct me or add, but I think generally speaking the class action complaints that are filed are cases that are on behalf of a class that would be defined as people with





recalled product implanted but with no current complaints or symptomatic reaction; and based on individual state law that would allow for a medical monitoring or some similar type of relief, those complaints have contemplated that type of relief.

And then there are other consumer-based class action complaints filed that are not medical monitoring necessarily, per se, and I think we would just simply get -- I think there are seven or eight currently pending. There are probably 10 or 11 states that allow for it that aren't currently filed, but I think what the goal would be is to try to fashion a complaint that encompasses the few states that permit a certain type of action to go forward into one complaint with a properly representative Plaintiff for each type of case.

So it would involve meshing different state law complaints into a single complaint; but I think, again, it's more of a streamlining process. It's not going to change what's currently pending as much as give us more efficiency moving forward.

THE COURT: Have you worked with Mr. Hollingsworth and Mr. Griffis?

MR. GRIFFIS: Yes.

THE COURT: I knew I'd get it right. About how





that might look? Have you all talked to each other about that?

MR. HOLLINGSWORTH: And Miss Latimer.

MS. LATIMER: That's okay. I'm going to speak up anyway. I'll address this with the Court's permission. We have had a dialogue about the concept of one class action being filed, which our clients are very much in agreement with, the idea that we ought to resolve it once.

Obviously our position is we don't think any class would be certified, and that would be a question for you at a later time; but right now we don't have any information about what that class might possibly look like.

There are nine federal class actions on file. Four of those purport to be national classes or national plus territory, U.S. territory classes. Another five are single-state class actions. Some of them explicitly seek personal injury classes, again, on a national basis. Some appear to be single-state medical monitoring causes of action.

So we are really at a disadvantage in terms of making any kind of proposal about schedule or what we would need to make that work because we don't know what that's going to look like; and 60 days or 90 days is a

very reasonable proposal, it seems to me.

THE COURT: What's more reasonable, 60 or 90?

MS. LATIMER: Our client is very interested in getting this very obviously important issue resolved. The cases have been on file for some time. In fact, the case that brought us to your Honor and formed the MDL started out as a class action. So it's our view that the Plaintiffs, you know, have had time to think about this.

On the other hand, we know that they have to get all the other counsel in on the master class action, if that's the right terminology. So we would not oppose 60 days. We would not oppose 90. We're comfortable with it, but I need to make one other observation if I could, your Honor.

There are -- we're aware right now of about 250 federal cases that are on file. Only about half of those or fewer than half have been already transferred to your Honor for purposes of this MDL. It's our expectation that in the event that a class would be certified, again, not something I'm anticipating, but that a number of those cases, at least possibly those Plaintiffs, will be members of the class.

And so we believe that the class issue needs to be resolved first, that there ought to be a schedule in





place to allow us to do that first and, you know, talk about the schedule that had been incorporated in other MDLs, but that even seems premature to me.

THE COURT: I think that's putting the cart before the horse, and let me throw another point out to you. At some point along the way, as I thought about even the class action that's been filed here, I had some conceptual issues with how does this work. And those issues that I have stem from my own ignorance about the product itself; how it works; how it's failed; what the potential is for failure in those folks who have them now, they're walking around with them; what happens if it breaks; do you have any numbers on whether or not if you get past it being inside for a year, two years, do you then have a lower percentage of it failing.

So at some point what I'm going to ask, and I'd like you to think about it on a going-forward basis at one of these conferences off the record, I'd like both sides maybe to work together on a little bit of a tutorial that addresses those questions because ultimately I'm going to have to figure that out when we get to the whole class certification issue.

And that would be greatly helpful to me, too, in trying to think about how we go forward even on the





individual cases and talking about working them up.

There's -- one of our agenda items is to talk about identifying some bellwether cases for trial, I prefer to think of it as for settlement, but I think I need to have that information in order to make an informed judgment about that.

So what I think we will do is this because as I sit here and listen to you, I don't want to impose unworkable deadlines. If we go out 60 days, that includes the holidays coming up, and I think it's unrealistic to think that you're going to get it all done and you'd have to come back and ask for more.

What I'll do is ask you to prepare an order that requires Plaintiffs to file a proposed consolidated class action complaint at the end of 90 days.

Now, I'm a reasonable person. If you get to the eighty-ninth day and you need a couple more days, talk to the other side; and if you get agreement with the other side, if you need a little extra time, then just let us know that it's going to be a couple of days beyond the date. I don't want to hear about, and Judge Almond doesn't want to hear about, I need an extension and he won't give me one.

MR. MIGLIORI: Could I speak on one of those issues?





THE COURT: Sure.

MR. MIGLIORI: The concept of a tutorial is great. We'd love that. In fact, in just preparing our cases, we're starting to put together what we're calling sort of a blue-ribbon panel of experts who can sort of talk about the shape and scope of the problem; and at whatever level the tutorial would be, we actually enjoy the opportunity to share that information.

THE COURT: I don't think I want to have -- I don't want a medical school course. I really just need to know the fundamentals of -- you know, I've read all of or just about all of the complaints that have been transferred here. So I've read, you know, all of the stories in those complaints. It's bare bones.

But what I need to know are the things that are not in the complaints, like if you have someone who's walking around with one of these things and what's the failure rate, does the length of time that it's inside somehow inform whether it's going to fail or not fail, what's the nonfailure rate, and that sort of thing because at some point, as I say, that will be important.

So I appreciate your panel of experts. What you may do is have them address those kinds of questions

and then funnel me the information at some point.

MR. MIGLIORI: And what we had contemplated given the Court's agenda is maybe we'd even incorporate some of what at least our experts are telling us into the fashioned complaint. So over that period of time, we'll put that in.

But on the concept of the class actions going first and being the primary issue, this is the major area of dispute because, as the Court knows from reading some of the individual complaints, we don't want the class action discovery and that process to somehow put people with real-life injuries, real-life problems aside because there are individual complaints filed for people who are very sick, who are in critical condition.

So we would be -- just to get it out on the record, we think it's very important that whatever we do on the class action side be a parallel track for what we do for individuals.

THE COURT: I understand that, and that's why I say I know you're talking about bellwethers for trial. I'm talking about bellwethers for settlement before you get too far off the track.

Have you talked about filing a master complaint for individual personal injury actions?





MS. LATIMER: Before we even move on, one other thing on the class or a couple other things that I just want to make sure that we're talking about the same thing.

Since there are these I'll say I think it's nine federal class actions that are filed that we're aware of right now, it is the proposal that those classes will be withdrawn, and is counsel in a position to control those cases and those lawyers such that we're just dealing with one?

THE COURT: I think that goes without saying. If we're going to go this route with a consolidated, I think and I understood Mr. Migliori to be saying that what he's proposing to do is to bring in all of the claims there so you're dealing with one complaint, I'm dealing with one complaint, and then we'll sort it out.

MR. MIGLIORI: It is. And in the September 11th litigation that we have for aviation security cases, we don't ever dismiss the individual complaints for tolling reasons; but we have a master complaint that supersedes, and it tries to incorporate the claims.

But when it gets to damages, it's very important not to dismiss the individual complaints because there may be prayers that are specific that we want to be preserved. So I think as a process, there are those





that are filed with the MDL number and then in the original docket numbers that don't ever get dismissed, and that's what I would anticipate.

THE COURT: And what I would ask you all to do is to work out the particulars on that so that everybody's on the same page as far as what we're doing, but I can appreciate your concerns.

MS. LATIMER: And then my second and final observation with respect to the class, and I'll address the bellwether issue if that makes sense present the agenda, but what we are contemplating and what I think is required by lexicon is either an amendment of one of the cases that's already been transferred in for purposes of developing this master class even if it's a wholesale substitution of ideas and class representatives and so forth. We're not talking about a brand new filing directly into the MDL for purposes of this.

THE COURT: I don't think you can file into the MDL. I know somebody raised that at the very first meeting; and from what I've read, I don't think you can do that. If you think you can, then you need to point me at some authority that says you can; but I don't think you can.

MR. MIGLIORI: Our position is that you can file





a master complaint directly into the MDL, which is different from a new action.

THE COURT: That's different because I think that that's really taking what's already here and massaging it and giving it a different form; but to file cases directly in, I don't think you can do that.

MR. MIGLIORI: If you want to speak to that --

MS. TORISEVA: Your Honor, there is -- that has been done and is being done in the Vioxx MDL, and it is a management issue. It's, frankly, more efficient to do it this way. You can file directly into the MDL. You can identify the appropriate venue if you were to file originally in the appropriate venue under the federal statute that gives venue when you file the case, file it directly into the MDL.

In the event the MDL is not successful in finalizing a settlement, which means the cases go back to the federal district courts where they originally belonged, then those remain and are still appropriate.

What is required is the consent of the Defendant to stipulate to this venue being an appropriate venue for that purpose with the agreement, and Mr. Migliori has the order.

MR. MIGLIORI: We provided this to Defendants earlier, but this is what Judge Fallon did for that

purpose.

THE COURT: Well, I'm not going to decide it now. What I would urge you to do is to talk to each other. If you have agreement and you can work this route, then tell me, and we can take that up when we meet again. If you do not have agreement, I think what I hear you saying is you don't go that route.

MS. TORISEVA: I believe it requires a certain consent that's voluntary on the part of the Defendant in order for it to work. It's like a tolling agreement.

THE COURT: And if you don't have that, then you can't do it unilaterally.

MS. LATIMER: We decline to consent to that. We're not going to waive our lexicon rights at this point.

MS. TORISEVA: Then the issue is resolved.

THE COURT: So that's the end of that, and you can take that back and say hello to Judge Fallon for me.

Let's get back to item number 2 on the agenda, and that is the filing of a master complaint for the personal injury actions. Have you talked to each other about this?

MR. MIGLIORI: We have in the same context that





we've -- again, in other litigations that we have been involved, and there are different ways to do it, but typically there would be a filing of an individual master complaint that would have the basic elements and then there would be individual docketed cases that would exist on the docket but would allow for new cases. Instead of to have to go through the tag-along process, new cases would be adopted.

THE COURT: What is the benefit of doing that?

MR. MIGLIORI: It really is tied into this other issue of the lexicon; that is, if, in fact, the goal is to be efficient and try to get this so we can get our arms around all the cases, as the Defendants have asked, and to get their Plaintiff fact sheets so they can figure out the scope of their problem, which is what we're all trying to do, then the goal would be to come up with a system that gets complaints before this Court as quickly, as efficiently, as appropriately as possible without having to file in a local district, get tagged along.

We don't know -- as of yet, we don't have any agreement on accepting service voluntarily, so then going through the service process, doing all the things that add cost, time and delay.

So it really -- these issues, although they're





separated on the agenda, really fall in the same goal. If you're trying to do this efficiently, these really should come together, and we haven't been able to come to an agreement on trying to streamline this process.

THE COURT: Are you still talking about it?

MS. LATIMER: We're not talking at this point on the notion of filing a master complaint on the individual personal injury cases.

THE COURT: What about accepting service?

MS. LATIMER: On service, we are amenable of accepting service pursuant to the -- so long as we get the benefit that the MDL would allow.

THE COURT: Why don't you do this. Why don't you include that. I'm going to have Mr. Migliori draw the order. Obviously, you're going to take a look at it before it goes out. So you two can collaborate on that. So let's include that with your requirement.

MS. LATIMER: Yes. And as to the -- again, the individual or the master complaint on the individual personal injury cases, our client is opposed to that and thinks that, again, its lexicon rights are being implicated, that we're not getting a fair look at what the real claims and possible defenses are.

We're creating all sorts of conflicts of law, problems at the outset, and it's just a work-around of





the MDL and lexicon as opposed to something that is designed to be a complementary process. So we object to that.

THE COURT: I have to tell you, I'm not convinced that that helps matters along as much as you say it does. It seems to me if you've got an individual personal injury action, you're going to evaluate that on the basis of its facts and its law and then decide where you're going to go with it.

So I'm not totally convinced on that one. And where you don't have an agreement, I'm not going to muscle people into an agreement.

MR. MIGLIORI: It does require consent. The reality is that we have been on another issue working very closely to try to finalize what's called a Plaintiff fact sheet.

THE COURT: I'm glad you raised that. That wasn't on the agenda items, and afterwards I thought, gee, I thought they were really interested in doing that, and it sounded like a good idea to me.

MS. LATIMER: We're close on that.

MR. MIGLIORI: It's folded into the case management order, which is more complicated because it tries to attack so much, including Plaintiff fact sheets; but the reason this whole thing works in terms

of efficiency is because the point is to get here quick enough where the Plaintiff fact sheet which does provide all that individual information --

THE COURT: And you're going to need that no matter what form you bring it in. So it seems to me why gum up the works with another layer of a so-called master complaint when you're going to do it anyway on the individuals.

I'm delighted to hear you say you're working very closely on that; and so I hope once you've gotten final on that, obviously send me a copy of what you've agreed to, and if -- and we really ought to be able to address when those are going to go out and what kind of a time frame you're going to need to have those returned. These folks need that.

MR. GRIFFIS: I'm afraid the status -- we're at a final impasse. We've negotiated through 95 percent of it, and we're very close; but I don't think we're going to be able to get the rest of the way because the one point that we're stuck on is what we consider the most important question.

THE COURT: Which one is that?

MR. GRIFFIS: That is we believe that each Plaintiff should be required to state whether they contend that their ring broke.





THE COURT: That?

MR. GRIFFIS: Whether the memory recoil ring in the product broke, which is the subject of the recall, the subject of 90 percent of the dockets, subject of 90 percent of the liability theories in the class action, et cetera.

In our view, the Plaintiffs' version doesn't adequately tell us that and would enable individual Plaintiffs to not really answer that question and not reveal that information. So we have very frank questions, do you contend that the ring broke.

THE COURT: Let's do this with that because that concerns me greatly because I don't think you can move ahead until you've got those. I think that that's a vehicle that, as I say, will save everybody a lot of time, effort and will -- as you say, you've got sick people out there who want to have some compensation, not only now but into the future, for whatever else they're going to have to go through. So that's what our goal ought to be ultimately.

What I would suggest you do is this. To the extent that you have agreed on what it's going to look like, put those items together. To the extent that you haven't, let's isolate the areas that you say you don't have agreement on and let's talk about those next time





we get together; and if need be, we'll have a hearing on that, and I'll issue an order. But I feel very strongly that Plaintiffs are going to have to answer those kinds of questions.

MR. MIGLIORI: And we're glad to do it, your Honor. In fact, we've gotten through the whole process. The concept of the Plaintiff fact sheet in a litigation like this is very, very important. Where we're stuck is now they're trying to get to, even in normal litigation, the contention interrogatories that are usually preserved until experts are retained and they want in a preliminary disclosure contentions.

THE COURT: This may be where I'm not as familiar with the facts as you all are; but if someone has undergone a repair surgery because the thing -- they had all kinds of internal injuries and they took the thing out and it's broken, they know it was broken. So if somebody's got that situation, they ought to be able to answer that question.

If they don't know, then they ought to be able to say they don't know; but at least the Defendants then know this is somebody we'll have to follow up on because I don't view the fact sheet as foreclosing additional discovery in those cases where you're going to need to do some follow-up; but what it does is it





eliminates those cases where you've got -- it's very clear what's happened.

MR. GRIFFIS: And neither does a contention interrogatory shut the door forever.

THE COURT: And these folks need to know what they're dealing with.

MR. MIGLIORI: Absolutely, your Honor. Just so the Court's aware, the friction is that the Defendants are trying to shape this as a ring-break-only issue as opposed to a failure of a product, whether it's recalled or not recalled. We now have an MDL over products that are not working. Some have been recalled, and some haven't been. There are cases of nonrecalled products here.

THE COURT: That's part of what I need to know.

MR. MIGLIORI: So we'll disclose all of the injuries as we know them. We just don't want -- since it's posed as a contention, we don't want the omission of a positive answer to say, okay, this isn't part of the group. It has to be what we're able to discern now from what we learn, and that's the point of a Plaintiff fact sheet.

And as we get further in time and get more medical information and get more expert testimony, then we can say either yes or no. Sort of the 30(b)(6)

answer, if you don't answer it, then it must be no.

THE COURT: Can someone on this side answer this question for me. As I understand it, there were two recalls.

MR. GRIFFIS: There were three recalls.

THE COURT: Three. What was the basis for the three recalls?

MR. GRIFFIS: The basis for all three of the recalls were reports of memory recoil ring breaking.

MS. LATIMER: In different products.

THE COURT: Okay.

MS. TORISEVA: Your Honor, if I may just briefly, I think the tutorial you mentioned is an excellent idea. I think you'll get two completely different version, and you need two completely different versions probably.

I suspect that their version from the medicine to the product failure is all going to be different from what our version is. And from our clients' perspective, it makes sense, it seems to me, for you to probably hear a brief version from each of us if you want, I think, the total picture. And it really does sort of affect all of these issues we're currently grappling with.

THE COURT: We'll get to that bridge eventually.





I'm learning as I go along. As I say, you all know more about this than I do. I threw that out there as an idea at some point. I think it would be helpful to us to understand the mechanics of what's involved to be able to intelligently address some of the issues that you have.

But I would say at the very least that you need to work on those fact sheets. As you say, you've got 95 percent or agreement on 95 percent of it. On the five percent where you don't, if we can help you, and here's where maybe Judge Almond could mediate a little bit and try to work around that to see how we can get these things finalized so you can start and I can issue an order that says these are going to be used and you've got X number of days to complete it and return it.

MS. LATIMER: That's possible. With the advice that you've just given us, we may be able to resolve the last five percent. I don't know.

MR. MIGLIORI: We'll continue to talk.

THE COURT: I don't think you ought to view it as this is the end of discovery, that we're foreclosing; but I think if you have some unanswered questions, and it may well be that some of these people can't answer the question, then of course you're going





to be able to follow up with discovery.

The point of doing the fact sheet is not to have to ask all the questions that they do have answers to during the course of a deposition or an interrogatory.

MR. MIGLIORI: I know it's not formally on the agenda, but co-involved with the Plaintiff fact sheet is a Defendant fact sheet that we've proposed. And that actually speaks on an individual basis to what Davol or Bard knew about a particular patient in many respects.

And it's not broad, general liability discovery as much as it's that we know from doctors, for example, who have removed product that Davol or its representatives were very quick to get out to the doctor and try to get the product back, get the actual explanted product in its own possession. Some doctors agreed; some doctors resisted. So we have some product; some we don't.

There are very specific facts on a case-by-case basis which shape the whole story, and it's very common to have a Defendant fact sheet, and we've proposed one. We've received a wholesale "we're not willing to do it at this time" response. So we think that these are co-involved.

Again, we understand the Court's position. We





don't need to get the whole story done at one moment. We do think that, on a case-specific basis, it should be concurrent. And so that may be something that we should bring to the magistrate or get advice from the Court at the next conference when maybe we can send both copies of what we're proposing to the Court.

THE COURT: Let's deal with one at a time because I think if I give you too much to do, you're going to get nothing done.

So what I would suggest that you do is, let's clean this one up. Let's get the Plaintiff fact sheets going. You're going to have to do those. On the defense side, think about the possibility on individual cases whether or not it makes sense to have some bit of a form. Otherwise, you're going to be answering -- you're going to answer these questions anyways. You're going to answer them this way or you're going to answer them another way.

Why don't you think about it at the very least and see if there's some way you might be able to compromise on down the road on these.

MR. GRIFFIS: What we think, your Honor, as Mr. Migliori suggested, is that this is primarily a scheduling issue, not a discovery issue. Although we have some disagreements with the consent --

THE COURT: It's time and what form.
MR. GRIFFIS: It's mostly a question of whether the Defendants are supposed to spend that time right now answering a bunch of case-specific discovery rather than engaged in some other aspect of this process.
THE COURT: That's why I say I think we put that one aside for now and concentrate on finalizing a Plaintiff's form so we can get these out and these folks know what they're dealing with.
Let's move right into bellwether trials. Have you all talked about whether that makes sense?
MS. LATIMER: We haven't --
THE COURT: You can say you talked. You don't have to say you agreed.
MR. MIGLIORI: I can quote.
MS. LATIMER: We didn't get much further than a suggestion by Plaintiffs' counsel that they thought it was appropriate and a response by us that we thought not appropriate and certainly not appropriate yet. It's not even something that we're comfortable in discussing yet because we don't know what the array of cases is.
It's interesting to hear the observations of counsel that we're dealing with multiple products, some recalled, some not recalled, not just about ring





breaks, it's about a whole range of product failures, it's about a whole range of injuries.
So what that instinctively tells me is what is it that a bellwether trial would be representative of, what would it be setting the value for, if, in fact, there were a value needed to be set. I don't know because I don't know how the -- what the array is right now.
THE COURT: Let me make a suggestion to you because, as I understood this when the case first came in, it really was on product failure ring breaks. That's how I understood it.
Now, I may be informed later on that it's something more than that, but I understood and most of the individual cases I've read seem to be saying just that. And it occurred to me as I was reading the individual cases, I think I recall one death that is attributed and then there are gradations of injury that have occurred with multiple repair surgeries and long hospitalizations, everything from that end to someone who ended up in the ER, they did an MRI, took it out and is doing fine.
We have, the local folks know our magistrate judge of legendary settlement capabilities, Judge Lovegreen, who is doing just settlement





conferences these days. He has been around for what, about a thousand years?
MAGISTRATE ALMOND: At least. Before I was born.
THE COURT: And he is highly respected in the community. He spent many, many years as a practicing lawyer and many, many years here as a magistrate judge. And as I say, he's on recall status now, so all he does is settlement conferences.
I would like to pull him into this. His availability, however, after next June is questionable. These retired guys actually like to do things other than work. So if I can get him on board to work with you on what I call a more representative group of these real ring break cases so that both sides get a sense of where we are, sort of an early neutral evaluation, if not an actual settlement conference, so that you know what the ballpark is, this side knows what the ballpark is, and then as you approach each of the other hundreds of individual cases out there, I think you'll have those numbers in mind. And his observations, I think those would be very, very helpful for you to have.
As I say, though, his availability after next June is questionable, and so it would mean that you would have to fairly soon start working up I thought





maybe 6 to 10 cases, and I'd like you to think about that. Work up 6 to 10, and make them truly representative, as I say, everybody from the person who spent three months in a hospital with multiple repair surgeries to the person who showed up in the ER on a Saturday night and had a relatively simple surgery and then got to go home.
MS. LATIMER: I guess my problem right now is I don't know how to do that before June. We don't even have an agreement on the fact sheet.
THE COURT: You will. You will have an agreement on that probably in a month.
MS. LATIMER: Then we'll get a fact sheet returned to us, and then we'll start to get medical records, and it will be very difficult for us to get a handle on what, again, is the array.
THE COURT: What I'm suggesting is, I'd like you to spend some time doing that because I think that that would be a valuable exercise for you.
MS. LATIMER: But I don't understand how to pick the six to work up, I guess is my point. It's all in the Plaintiffs' selection. So, therefore --
THE COURT: I think you've got the complaints as well. You've read them as well as I have; and as I say, as I read through them, I see gradations of

injury. And what I would suggest you do is look at how many repair surgeries, what kinds of injuries were involved, what was the length of hospital stay and that sort of thing as the common denominator because obviously you're going to have people different ages, whether or not they're working, what they made, lost wages, that kind of thing; but I'm talking about a common denominator on the injury and the medicals.

MS. LATIMER: Right. I understand your Honor's observation. I disagree that we're going to be able to assess and figure out what common denominators exist in relatively short order.

THE COURT: I don't think so. I think you folks have been at this for a whole lot longer than I have; and I think that if you put your mind to it, you've got all kinds of great minds in this room, that if you look hard enough and you work hard enough at it, you could work up a half a dozen of these. For him to have you in next June, he could do one or two a week.

MR. GRIFFIS: One issue that we're facing, your Honor, in evaluating the cases is that what medical literature shows and what our experience is with our hernia repair products is that a significant percentage of patients who have a hernia repair with any device or even using a technique called tissue-to-tissue repair





where no device is used at all have pain, discomfort, have various complications; and, therefore, a significant percentage of all patients who have ever had a hernia are potential Plaintiffs to the extent that they feel that they've -- you know, they're unhappy with their surgery.

We believe that up to 90 percent or more of the cases that are in federal court or in the pipeline coming to federal court right now fall into that type.

THE COURT: I'm talking about those where there's had to be a repair.

MR. GRIFFIS: Even where there's had to be a repair, your Honor --

THE COURT: Where there's been a break.

MS. TORISEVA: Your Honor, if I could speak --

THE COURT: Because those, you're not going to walk away from those. The reality is, if you've had a break and it's punctured some internal organs, you've got somebody who is really sick and had to have repair surgery.

That's why I say if you concentrate on those, those are the ones that you're ultimately going to have to settle anyways. You're not going to try those.

MS. LATIMER: My point is, that information just is entirely in the Plaintiffs' hands --





THE COURT: It will be in your hands as soon as you get the fact sheet.

MR. MIGLIORI: In 30 days, your Honor.

MS. LATIMER: I hope that to be the case, your Honor.

THE COURT: I would like you to really think about choosing some of these and utilizing his services. I think it would be very valuable to you. As I say, his availability thereafter is limited. So if we're going to move this along, I'd like to get some of these before him sooner rather than later. So I'm talking about the ones that I've read where it's pretty clear something broke, it cut somebody up inside, it's out now, but they've had to have two, three, four surgeries, they were in for however long.

He's going to measure for you and he's going to give you his eyeball on what the case is worth, and I think that that's valuable information that both sides should have on a going-forward basis.

MS. LATIMER: Your Honor, one other observation on the bellwether, and this I think is probably well beyond what the Court is talking about; but it's one thing to enlist the mediator services for evaluation purposes, but on the bellwether trial itself, I wanted to point out now that we're going to have additional





objections to that issue.

THE COURT: That's why I said I'm not going to talk about bellwether trials because I'm not so sure about those. I'm talking about early neutral evaluations, which is a different animal.

MS. LATIMER: I understand because since we started out with the bellwether trial moniker --

THE COURT: I took executive prerogative and privilege and turned it into what I really wanted to talk about, and so now you know where I'm coming from, and I think we saved the whole bellwether trial issue for another day because I don't think you have agreement on that.

MR. MIGLIORI: As long as we're moving, this is very positive movement, is there a time period -- this is the breakdown I have. Of the 163 complaints that we've identified in federal court as of the 26th, there are as many as 29 that are ring break or pled as ring failure cases. In others, it's unclear in the pleading.

We will identify -- we can do it probably within three weeks, identify the 6 to 10 that we'd like to propose for that purpose and get the PFS out with those cases.

THE COURT: I think that would be really

helpful.

MS. LATIMER: I would very much like to know what the ring break cases are. I am still concerned that an evaluation that we might get would be representative of -- even of the next ring break case, and yet my client very much wants to identify those cases in part for the reasons you're suggesting.

MR. GRIFFIS: First we'd like to see the fact sheets for all of the ring break cases.

THE COURT: That goes without saying; but the first step is, you've got to identify which ones they are. So I think if you do that in tandem with working up the fact sheet, that we can, the next time we meet, set some deadlines for when we're going to do certain things maybe with specific cases; but if I don't mention it now, you won't do it until the next time.

I think we have talked about direct filing cases into the MDL. Let's skip over number 6, status of case management order. How are you doing on your 26(f) disclosures?

MR. GRIFFIS: We're working on scheduling a conference, and I've proposed four times and dates next week to have that conference.

THE COURT: Okay. Very good.

MR. MIGLIORI: If I may ask, just because we





have so many people working on the case, Rhett Klok from my office, my law partner, is there anything else?

MR. KLOK: Two items, your Honor, on the PFS, going back to that quickly. We're really one question away, which is what the Court has covered already. So it really shouldn't take that long for us to even -- maybe even a phone hearing to get that issue before the Court. It's really a question of putting two versions of the same question and how it's phrased.

THE COURT: That would be helpful, and I think especially if Judge Almond is the one that's going to mediate that.

MR. KLOK: There may be two smaller issues, but that's the main issue. On the issue that your Honor and Mr. Migliori brought up, I have to call our technical expert, but he's at our availability; and as long as the schedule allows it, we can fit into any of the four scheduled dates.

THE COURT: So it's going to happen next week?

MR. KLOK: It's going to happen.

THE COURT: Let's go back now to the case management order. Have you all thought about what that should look like? And hopefully you have some agreement. I see nodding heads. That's a good thing.

MR. MIGLIORI: We've thought about it.





MR. GRIFFIS: We submitted one to Plaintiffs before the last hearing actually, your Honor, and everyone's been contemplating it since then; but we got a response from them last night with a mock-up. This is the red-line version.

So we haven't finished talking about it because there wasn't time. I think that it may well be the case that we can, since the issues on which we disagree aren't issues that are integral to the issues on which we do agree for the most part, we can probably put together a shorter case management order on which we do agree and submit that fairly quickly and then leave the remaining issues for later.

THE COURT: Why don't you go ahead and do that because I think the sooner we get that filed, the better.

MR. MIGLIORI: I think we tried to get at too many issues in one document, and I think it's better if we piecemeal it.

THE COURT: That's fine. And to the extent that you have some issues that you need to be addressed, put them on for one of the later conferences, or if you need to file a motion, then do that.

Pending motions. Thank you for the list. It was not as extensive as I thought it was going to be,





thankfully. Any thoughts on scheduling hearings on those?

Let me ask you on the Von Essen case, in the New Jersey case, and I remember the young man representing Plaintiff in that case was very anxious to go back to state court in New Jersey, I know you all have objected to the remand. Has there been any movement at all on that particular case? Has anybody tried to settle it? Have you tried to do anything with it?

MR. GRIFFIS: No. We don't have discovery on which to base it.

MR. MIGLIORI: I think there are some motions that are probably either moot or should be delayed because they relate to class issues, but the remand seemed to be a discrete group.

THE COURT: Okay. I will look over those again; and to the extent that I think I need a hearing or to hear argument on it, I will schedule those. Are there some days that are better for you than others, or are you all pretty much available?

MR. MIGLIORI: I think the afternoon works well for travel purposes, but any day is fine for us.

THE COURT: We'll try to keep that in mind for you folks that have to travel; and to the extent we can

do them without argument, that one in particular stands out in my mind because you've all pretty much argued it to death in your papers.

MR. GRIFFIS: I want to say a couple of things about some of the items on the list so that you won't decide them. On the first item on the list, and I don't know if you have a copy --

THE COURT: Do you have that?

MR. MIGLIORI: You can have mine, your Honor.

THE COURT: I'm going to mark it up. Do you mind?

MR. MIGLIORI: Not at all.

MR. GRIFFIS: The first item is the motion to dismiss the Monteil complaint, and --

THE COURT: Yes. Are you withdrawing that?

MR. GRIFFIS: We are not.

MR. MIGLIORI: I think we said effectively we have because it's going to be moot until we see what's pled.

THE COURT: So you are withdrawing it?

MR. MIGLIORI: Without prejudice.

MR. GRIFFIS: They're withdrawing the motion upon which our motion is made, so it will then become moot.

THE COURT: Why don't you file a stipulation





that withdraws everything.

MR. MIGLIORI: Unless you're saying we're withdrawing our complaint. We're going to keep the complaint filed. We're going to incorporate the complaint into a master class complaint.

THE COURT: Why don't you come up with a stipulation. I think what you're doing is, you're not moving to dismiss this particular one, but you're holding off and at some point you'll be filing something else.

MR. GRIFFIS: That's likely the case.

THE COURT: For the time being, what I don't want to have is a motion pending.

MR. MIGLIORI: We'll file a stipulation.

THE COURT: So let's do something with it that puts it to rest without prejudice. Obviously you can refile it when he files the amended. Okay.

MR. GRIFFIS: The other one I wanted to bring to your Honor's attention is the Campbell case. That was the first case actually filed. It does not involve Bard or Davol, although Bard and Davol was sued. It does not involve the Bard or Davol patch. It involves the Kugel patch. It was manufactured by a different corporation, and the gentleman who is representing the surgical centers stood up at the last hearing and





mentioned that he had a motion to dismiss pending.

THE COURT: What is the Plaintiff saying in that case?

MR. GRIFFIS: Well, I don't want to speak for him, but not much.

MR. MIGLIORI: That's not our case.

MR. GRIFFIS: He's not here today, and I don't want to speak for him; but our position is that this case doesn't belong in front of your Honor because it doesn't involve the Composix Kugel patch, and we will move to remand that case.

THE COURT: Well, you've got a motion for summary judgment.

MR. GRIFFIS: And we think that motion should be decided by the judge on remand and held in abeyance for now. You should not rule on it.

THE COURT: So what you're asking me, then, is to remand it? What you need to do is file that motion quickly so I can do that.

MR. GRIFFIS: Yes.

THE COURT: And why don't you do yourself and me a favor and call the other side and ask if he's going to object to the remand because if he isn't, you can do it as an assented-to motion, and then with a click you're back. You're back in Arkansas. Okay.





MR. MIGLIORI: When you asked Kirby -- as liaison, I'll be glad to do anything. Do I trust that I don't need to do anything on that issue?

THE COURT: Don't do anything on that one. He is going to call Plaintiffs' counsel, tell him that he's moving to remand it. Make sure if Plaintiffs' counsel is on board, go ahead and do it as an assented-to motion, which I will then grant. It's got to go back through the MDL and back to Arkansas, and that way we can move that one along. Thank you.

How about any of the others?

MR. GRIFFIS: The other one that I wanted to mention was Mathein. It's on page 2, and it's the last one that's mentioned before the section of matters that have been resolved by agreement.

In this one, Plaintiffs pointed out that we did not answer the complaint. There are a number of cases that were transferred to the MDL before an answer was due, and an answer is needed in this case; and what I would propose, that the CMO that we're working on, just set a deadline for all those answers, including this one.

MR. MIGLIORI: There's one case in particular, it's not our case, but in trying to gather this information for the Court, I learned from one counsel

that there's a dispute on the other side of that where Plaintiffs' counsel is being told that they didn't respond in time and so they should be -- or they didn't file a brief for a particular motion to dismiss or something like that.

I know that that counsel would want me to ask that the same be true for responses to pending motions.

THE COURT: Why don't you talk to Plaintiffs' counsel in that case and get together with Mr. Griffis and come up with a stipulation that will give both sides the time that they need to do whatever they need on those.

MR. GRIFFIS: Very well.

THE COURT: So we can take care of that. Great. Any others that you wanted to talk about?

MR. GRIFFIS: No, your Honor.

THE COURT: And then we'll take care of the rest of them, and the others that you recorded have been resolved by agreement. I think you're going to need to file something formally that takes care of those.

MR. MIGLIORI: I think, your Honor, if I may, those were pending motions until the tag-along. So they're actually moot. We put them in out of an abundance of caution, but they were motions for stay that hadn't been resolved; and then the case got





transferred to you, which the automatic stay was in place, so they were really ruled upon.

THE COURT: All right. And then we have -- you mentioned some others that have not been transferred. Have those been transferred since you did your list?

MR. MIGLIORI: We've had two since tag-along orders, and I believe those were incorporated with the others. The last time we were in front of your Honor, I think we had 107 or 8 filings and now, by our count, 169 filings, and not all of them have been transferred yet.

THE COURT: Unless there's any other issue that you want to talk about that is not on the official agenda, the next item is really to talk about the next meeting. So have you all thought about that? When would be a good time? I have some dates that I can give you when I know I am available. And you say the afternoons work better? You folks who come up from D.C., are you able to fly up and back the same day?

MS. LATIMER: We can.

THE COURT: Save your client a little money.

MS. LATIMER: We can, and a 1:00 start is actually a little better for us so we can actually get out.

THE COURT: Can you get here for one?





MS. LATIMER: Yes.

THE COURT: I had -- because I think if we can get together on a monthly basis, it will help us build a little bit of momentum and move things along. I have available the 30th of November, which is a Friday; the 5th of December, which is a Wednesday; the 6th, the Thursday; and the 7th, the Friday. So tell me what's best for all of you.

MR. MIGLIORI: They all work for me, your Honor.

MS. LATIMER: I have a conflict on the 30th, your Honor.

THE COURT: Do you want to try the 5th? It's a Wednesday. Actually, I can't do one that day. I would have to do two. So why don't we go with the 6th at one.

And what I would ask you to do, I've asked Mr. Migliori to put an order together. Obviously he's going to send a copy over to you folks, and if there's anything -- you folks look it over to the extent that you need to massage it or whatever.

Now, on that issue on the Plaintiff fact sheet, isolate -- I didn't catch this fella's name over here.

MR. KLOK: Rhett Klok.

THE COURT: You're going to isolate those couple of questions that you say you have some disagreement





over. What I would suggest is that you make arrangements to have a telephone conference so that any of you who want to participate by phone can do that. Phone conference though, no more than two per side. Otherwise it gets a little crazy, I think. Let's try to resolve that and get those things done and ready to go out because I really think that's the key to move these things along and we can figure out what we're dealing with because, like you, I don't know what we're dealing with.

I know what they think they're dealing with; but what you have in mind, what you have in mind and what they have in mind is not the same thing.

MR. KLOK: Your Honor, would it be of assistance for both sides to have the 26(f) conference perhaps with the assistance of the magistrate, who I understand is an expert on electronic discovery issues?

THE COURT: No, and I'll tell you why. If you get to a point where you've got any electronic discovery dispute, you can file your motion and go see the magistrate judge; but I think you all are experts at what you do, you know what you're required to disclose, I trust you to do that without our assistance. And to the extent that somebody's holding back, I expect I'll get a motion and you'll have some

business.

MR. KLOK: Thank you, your Honor.

THE COURT: Use us when you really need us.

MR. KLOK: Yes.

THE COURT: Anything else today? Have a safe trip home. Have a good holiday, and I'll see you December 6th.

(Adjourned)





CERTIFICATION

I, Karen M. Wischnowsky, RPR-RMR-CRR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

Karen M. Wischnowsky, RPR-RMR-CRR

________________________________

Date