A

STATE OF MINNESOTA | DISTRICT COURT

COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT

---

In re Minnesota Penile Prosthesis Litigation | Court File No: PI 97-11183

---

## MEMORANDUM TO UROLOGISTS

On May 8, 1998, the Court ordered that Defendant American Medical Systems is permitted to retain as expert witnesses certain urologists who may have treated one or more individual plaintiffs in the above litigation. Notwithstanding their service as experts, however, these urologists are still bound by the physician-patient privilege.

Minnesota Statute § 595.02(d) provides as follows:

> "a licensed physician or surgeon, dentist, or chiropractor shall not, without the consent of the patient, be allowed to disclose any information or any opinion based thereon which the professional acquired in attending the patient in a professional capacity, and which was necessary to enable the professional to act in that capacity..."

The Court advises all parties in this matter that the urologists who serve as expert witnesses, absent the consent of their patients, must still protect any confidential communications concerning the medical condition of their individual patients.

Dated this 11th day
of May, 1998.

Myron S. Greenberg
Judge of District Court

EXHIBIT
tabbles
2

STATE OF MINNESOTA — DISTRICT COURT

COUNTY OF HENNEPIN — FOURTH JUDICIAL DISTRICT

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re: AMS Litigation ) **TRANSCRIPT OF PROCEEDINGS** File No. 87-11183

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

The above-entitled matter came duly on for hearing before the Honorable Myron S. Greenberg, one of the judges of the above-named Court, on the 8th day of May, 1998, in Room 1759 Courts Tower, Hennepin County Government Center, Minneapolis, Minnesota.

A P P E A R A N C E S

**FOR PLAINTIFFS:**

ROGER BROSNAHAN, ESQ.

**FOR DEFENDANTS:**

STEVEN GLICKSTEIN, ESQ.

SHEILA BOSTON, ESQ.

WILLIAM P. STUDER, ESQ.

A L S O  A P P E A R I N G

JANE JOSEPH, ESQ.

J. GORDON RUDD, ESQ.

DANIEL GOLDBERG, ESQ.

DANIEL J. JOHNSON, ESQ.

DAVID P. GRAHAM, ESQ.

Law Clerk: GREG WILKEN

Court Reporter: JoANN MYRAN WAHL

* * * *

COPY

EXHIBIT

tabbles

3

Case 2:08-cv-00174-AWA-DEM Document 88-4 Filed 02/29/2008 Page 6 of 16



(WHEREUPON, the following proceedings were duly had:)

MR. GLICKSTEIN: Your Honor, may I introduce one of my associates, Sheila Boston?

MS. BOSTON: How do you do, sir?

THE COURT: I'm good. How are you?

MS. BOSTON: Fine, thanks.

THE COURT: Did she get a ticket?

(Laughter.)

MR. GLICKSTEIN: We scalped a ticket for 25 percent extra.

THE COURT: From New York?

MS. BOSTON: Yes, I am.

THE COURT: You came in just for this motion?

MS. BOSTON: I did.

THE COURT: Are you ready to argue it?

MS. BOSTON: No. Just observe.

THE COURT: Okay. All right. This is the Minnesota Penile Prothesis Litigation, District Court File 97-11183. I know who counsel are and they are signing a list, so we're not going to have them identify themselves. This is the defendant's motion, although it's unclear really the genesis of the motion. It's defendant's motion to allow certain

urologists who also are or may be treating physicians of non-selected plaintiffs, non-selected in the first group of plaintiffs, to serve as experts in this case. It's opposed by the plaintiffs, and I'm ready to entertain anything that you folks may have to say in addition to the written materials that you've submitted. So if you have something that you want to say, I'll take my tongue out of my cheek, you may do so. Who wishes to speak?

MR. GLICKSTEIN: I just wanted to address any questions Your Honor might have. We did discuss this at the prior conference, and I certainly don't want to repeat the discussion we had there. If Your Honor has any questions or concerns, we'd be happy to answer them.

THE COURT: Okay. I do recall the discussion earlier. Did someone wish to speak from plaintiffs' side?

MR. BROSNAHAN: If it please the Court, I will be brief.

THE COURT: Actually I think you may be briefer than you'd like to be right now. Mr. Cahill.

(Sidebar discussion off the record.)

MR. STUDER: Mr. Brosnahan has two minutes.

MR. BROSNAHAN: I don't know if I'll take

them all. Defendants, in their moving papers, in their motion, they talk about -- want you to affirm some right. I don't know what the right is. I know that Wenninger the Court held, and you affirmed, that they can't talk to any expert, to any treating physician of any of the plaintiff's clients. They can't talk to them. Now that's the end of the issue. However, they raise two points. One, they say we won't talk about a plaintiff's case who isn't among those being tried right now. The whole point of Wenninger was you don't take the defendant's word for it. The whole point of prohibiting the ex parte interviews and the plaintiff's right to have his lawyer there is bottomed on the doctor may not be as aware of what he can say and what he can't say and so forth. That's what Wenninger is all about. So we don't take the defendant's word for it in Wenninger, and we don't take their word for it here.

Number two, they say it's not a plaintiff in this case, that this is like cases scattered all around the country, but you know better than that because of the way you set it up. You have called for two bellwether trials, and then some ADR or something to use those verdicts and so forth. You're not talking about trying 600 cases or 700 cases. You were talking about two

bellwether trials that would set the parties on a course where they go through ADR, I believe you said maybe bring in the same jury or a different jury or whatever. However that's done, it's perfectly obvious that what's testified about in the first two trials, what experts come, that testimony is going to permeate and affect all of the cases before you. So and I heard how you phrased what you thought the issue was about treating doctors, not of these plaintiffs and so forth, which gives me a hint about a tilt, but I don't think that that can be properly argued, given the fact that the first cases will affect all of the cases.

Now the final point, there are three elements in each of these cases. There is causation. There is damage and there is liability. The defendants say when we go and talk to Dr. Brown about this person's case, but not about his patient's case, we won't talk about causation or damages in that other one's case, but they will talk about liability. And it's the generic liability issues that will affect every case, including their own plaintiff. And if a plaintiff in this case loses on one issue, the liability issue, that doctor's patient stands to lose on the liability issue. So you know the doctors are in a conflict. Who's going to tell him? Are the defendants going to tell him? Are

we going to tell them? You know, and they say, well, we've used these, for years, these doctors. They may not have had a conflict before. But they've got one now when they are asking a doctor to come in and testify on generic liability and causation issues that can affect our clients, their patients.

Now they've made no showing about how many doctors they've used and consulted with in the past. They've made no showing about how many plaintiffs would be affected by these eight, formerly six, urologists that they want to use. They've made no counter to the fact that there are hundreds of urologists as shown on the attachments in Mr. Rudd's brief. They haven't met any burden here that overcomes the simple language of Wenninger, which says when they talk to a physician who's treating my client, I have a right and a duty to be there.

THE COURT: What did you say it stands for?

MR. BROSNAHAN: It stands for the proposition that the defense may not have ex parte conversations, conversations in my absence, with my client's treating physician. That's what it stands for. And that's what you've ruled and that's the end of this issue as I see it. Thank you.

THE COURT: I don't think Wenninger goes

quite that far, and I'm going to grant the motion. What I'm going to do, however, given the caution that you, obviously, are concerned about, is I'm going to use some instrument that will alert physician participants to the potential problems. Now I have no pride of authorship of this document that you're getting and I would certainly be amenable to having some appropriate revision. I have no pride about this because I didn't write it primarily.

MR. GLICKSTEIN: Whoever did was, obviously, brilliant.

THE COURT: You have a case involving Rider Bennett coming up?

(Laughter.)

THE COURT: So I am going to grant the motion. I do want you to look it over. And there will be a memorandum addressing the reasons for my ruling, and a caution that doctors who may be chosen to testify must be admonished not to discuss the specifics of a case in which they are the treating physician. But of course, that already stands as part of my earlier pretrial order, and you guys can look it over and give me your reaction.

MR. BROSNAHAN: If I may, I'd like to make one further point, Your Honor, and that is I don't

think that, you know, alerting doctors, again, I think Wenninger could have said that, could have said that in any PI case you write the doctor a letter. It's the problem with what the doctor knows about these subtle issues and so forth. I think we will submit then, to the Court, a proposal that limits what these doctors can testify about. We have generic liability issues. We have generic causation issues. We have generic damage issues, and we have case specific in each of those three areas. And I'm just thinking out loud now. It may well be that it will be necessary, at least in our judgment, given the Court's order, that the witness can only be called in certain of those areas so as not to effect inadvertently his non-appearing patients' case.

THE COURT: Let's step away from this case for a moment. Let's just take something other than penile implants. Heart specialists testify about heart problems all the time--

MR. BROSNAHAN: Uh-huh.

THE COURT: --as an expert, and may indeed be called upon to testify as a treating physician in a case in which a patient of that doctor has had some problem or complains of something. I don't think -- I'm not sure I follow the difference here that -- these

distinctions that you're making about what the doctor can testify about and what the doctor can't testify about.

MR. BROSNAHAN: Because I know exactly what's going to happen. They will put hypotheticals to doctors who don't appreciate all of the nuances of taking a position that they can then be confronted with when one of his patients is on the stand, or put in a position where we can't talk to him about all of the issues and so forth, and see what his opinion is vis-a-vis that particular patient because he's committed himself on these various points that the defendants have made, that haven't particularly impacted him one way or the other, because he isn't talking about a specific individual, let alone his specific patient.

You're going to have damage issues, causation issues and liability issues and, you know, and these are not like some heart specialist who has testified in a number of different situations around the country in different cases. This is a situation where we'll have liability issues about specific products affecting large groups of people in this courtroom. And that's an entirely different situation. Anyway I would like leave before your memorandum is filed, to submit a

supplemental brief on how we think these experts' testimony, under this peculiar situation, should be limited to protect their patients, and in our judgment to uphold what the Court said in Wenninger along with the attorney/client privilege problems or the doctor/patient privilege problems and the conflict problems.

MR. GLICKSTEIN: There is a timing concern, Your Honor. We've got an August 7th cut-off date.

THE COURT: Well, let me address that.

MR. BROSNAHAN: The Court has said they can go ahead and talk to them and so forth. I'm talking about what their testimony would be limited to at trial and it doesn't have to come up until then.

THE COURT: And Mr. Glickstein, you may assume that there are no limitations at this time. At this time there are no limitations. I'll entertain your memorandum. And I'll allow a response and I'll take a look at it. I'm bothered by two things, and I don't want to beat around the bush on it. I'm bothered by the idea that your comment implies that the urologists who would be selected by the defendants, are going to taylor their testimony specifically to some position as an expert which would be different than a position espoused as a treating physician.

MR. BROSNAHAN: Not at all.

THE COURT: Well, that's the implication I'm getting.

MR. BROSNAHAN: The implication is that when you're dealing with any expert, on an ex parte basis, you are an advocate, and you are clearly permitted to show all of the things that will support your position. And I don't care if you're a plaintiff or a defendant, that's what you do, and you get them into a thought process and you get them into a report in writing and so forth. And then you can do all of the cross-examination you want from the other side. There is a pride of ownership in that opinion. And I'm not saying that, you know, because someone's hired by a plaintiff or a defendant that they necessarily, you know, bend in that direction, but they do, because of how the lawyers affect them and how the evidence is presented to them and so forth. This is just a plain fact. And I can cross-examine them, and I can tell them about their individual conflict and so forth, but they're set by the time I get a shot at them. That's the whole purpose of Wenninger saying you can't have an ex parte; that the plaintiffs' lawyer ought to be there so the plaintiffs' lawyer can counter right on the spot before the opinion is formed with the evidence that he or she thinks goes the other way. That's what that

case is about.

THE COURT: I don't want to draw this out any too far, but I don't really understand this whole thing. If indeed these cases have not been consolidated in the fashion that they were consolidated and that's a big if, and I acknowledge that it's a big if, and I'm not ignoring that part of the equation, but there will be cases subsequent to these 7,000 cases that we have before me now and they -- unless we reach a solution in which the defendants provide everybody with a Viagra, I suppose --

(Laughter.)

THE COURT: That wasn't intended as a joke. That's a settlement possibility -- the same problem would always exist.

MR. BROSNAHAN: Yes. There is no getting away from it. I don't care if I had cases around the country or whatever. If I've got a <u>Wenninger</u> that applies, that doctor can't talk to this defendant.

THE COURT: Okay. I understand your position. I think you got my drift. Okay. Anything else? You've had a chance to look over this?

MR. GLICKSTEIN: This is fine as it is, Your Honor.

THE COURT: If you sign it, we'll present it

to the urologists.

THE COURT: Well, I won't make a decision on this until I've heard from plaintiffs on their -- for want of a better term -- modification of my order, however they wish to argue.

MR. BROSNAHAN: I don't think that ought to hold this up any. This is the warning to them to watch out what they say. It ought to go out soon.

THE COURT: It is. Well, it doesn't have to go out soon. I think it should be given to whichever experts goes --

MR. BROSNAHAN: Goes out to --

MR. GLICKSTEIN: We would present it to the expert at the time they contact --

THE COURT: Right. I had considered the possibility of identifying the defendant, but I don't know that I have that information. I'm assuming that you do, but I don't know that for a fact.

MR. GLICKSTEIN: You mean the expert?

THE COURT: That you know which experts are associated as treating physicians with which plaintiffs.

MR. GLICKSTEIN: Yes, we do.

THE COURT: Well, then you can identify the name of the case or cases with which they may possibly

have some kind of conflict.

MR. BROSNAHAN: We would want that, Your Honor.

THE COURT: And I just said I gave it to you before you asked, but we can argue about it if you want.

(Laughter.)

MR. BROSNAHAN: I'm just complimenting you on your good --

(Laughter.)

THE COURT: Okay. Anything else? Adjourned.

MR. STUDER: Thank you.

(Conclusion of proceedings.)

* * *

STATE OF MINNESOTA )
) ss **CERTIFICATE**
COUNTY OF HENNEPIN )

I, JoANN MYRAN WAHL, Court Reporter and Notary Public for the State of Minnesota, County of Hennepin, hereby certify that the foregoing is a true and correct transcript of the proceedings as herein set out.

JoAnn Myran Wahl

JoANN MYRAN WAHL, RMR, AE
Official Court Reporter
Notary Public
C-1759 Government Center
300 South Sixth Street
Minneapolis, MN 55487
Phone: (612) 348-5061

Dated: June 1st, 1998

STATE OF MINNESOTA | DISTRICT COURT
COUNTY OF HENNEPIN | FOURTH JUDICIAL DISTRICT

FILED PSL 98 APR 22 DEPUTY HENN. CO. DISTRICT ADMINISTRATOR

In re AMS Minnesota Penile Prosthesis Litigation : No. PI 97-11183

**DEFENDANT'S MEMORANDUM OF LAW**
**REGARDING EXPERT UROLOGISTS**

This motion raises an issue concerning expert urologists which the Court explicitly left open at the status conference on October 23, 1997 (Tr. at 23-24).

AMS seeks to retain as experts the eight urologists who have previously served as retained experts for AMS in the past five years. None of these eight urologists is the treating physician for any of the 20 plaintiffs selected for full discovery.

Plaintiffs assert that AMS should be prohibited from retaining any of the 675 urologists who have treated the 719 plaintiffs who have filed actions in Minnesota. As shown below, however, there is no legal prohibition against a physician being retained in a case not involving one of his own patients.

AMS would be severely prejudiced if it could not use any of the 675 urologists. These 675 urologists include the eight urologists whom AMS has retained as litigation experts in the past five years. If AMS cannot use any of the eight urologists whom AMS had previously used in the past five years, the Court and jury will be deprived of testimony from those urologists who are most qualified to testify about the medical devices at issue in this case.

## ARGUMENT

### I. THIS COURT AND THE JURY WILL BE DEPRIVED OF IMPORTANT INFORMATION, AND AMS WILL BE SEVERELY PREJUDICED, IF PLAINTIFFS' PROPOSAL IS ACCEPTED

In the past five years AMS has utilized eight urologists as expert witnesses in its product liability cases around the country: Dr. Irving J. Fishman, Dr. William Furlow, Dr. Robert Kessler, Dr. L. Dean Knoll, Dr. Terrence Malloy, Dr. Drogo Montague, Dr. John J. Mulcahy and Dr. Carlos Nazir. Johnson Aff. ¶ 3. Each of these eight urologists was retained by AMS as litigation experts before any of the Minnesota cases were filed. *Id.* ¶ 4. One of these eight urologists, Dr. Malloy, already submitted an expert affidavit for AMS in this very litigation in connection with AMS' forum non conveniens motion. See Ex. A. Each of these eight urologists has served as an investigator in clinical trials for AMS penile prostheses and each has implanted a large number of penile prostheses. Johnson Aff. ¶ 4. All but one have been teaching professors at prestigious medical schools and have published numerous articles in the medical literature about penile prostheses, and the eighth has implanted more AMS penile prostheses than any urologist in active practice. *Id.* None of the eight is a treating physician for any of the 20 selected plaintiffs. *Id.*

In short, the 675 urologists who have treated the plaintiffs in these cases include those urologists who are best qualified to testify about AMS penile prostheses. If AMS is not permitted to retain any of them as experts, including its pre-existing experts, it will be forced to use urologists with less experience with AMS penile prostheses. In effect, plaintiffs' counsel would be allowed to insulate the leading physician-experts from testifying for AMS in these cases simply because, through advertising, they solicited a large number of clients and aggregated all of their cases in one forum. If plaintiffs are allowed to succeed, the Court and the jury would be deprived of vital evidence, and AMS would be severely prejudiced.

Plaintiffs, in contrast, will not be prejudiced. At this point in time, AMS proposes to retain only urologists who have previously served as AMS experts.[1] Again, none of the eight experts is a treating physician for the 20 plaintiffs whose cases will be tried, so that no treating physician will be used as a defense expert in a case involving his own patient.

Plaintiffs' counsel has argued that these urologists would have a "conflict of interest" because they would be taking positions that are contrary to the litigation objectives of their patients who are plaintiffs in these cases. However, a treating physician is not an expert for the plaintiff, but a fact witness. As a fact witness, the treating physician owes no duty to support his patient's position; his only duty is to testify truthfully and to respect the doctor-patient privilege.

Moreover, these eight urologists have already been experts for AMS in other cases in recent years (one of them in this case). Accordingly, AMS has already discussed urological issues with them in the context of litigation, and no prejudice can result from further discussions. There is nothing unfair about permitting these urologists to present their opinions to a Minnesota jury, as they have done in cases outside of Minnesota.

## II. THERE IS NO PROHIBITION AGAINST RETAINING A UROLOGIST AS AN EXPERT IN A CASE NOT INVOLVING THE UROLOGIST'S OWN PATIENT

This Court has ruled that the 719 cases against AMS are individual actions. Because each case is separate and distinct, there is no legal restriction on AMS' right to retain a urologist who happens to have some patient who filed an action against AMS in this Court, to testify as an expert in a different case not involving his patient. That is all AMS seeks to do.

AMS' retention of urologists who would testify only in cases not involving their own patients would not violate Minn. Stat. Ann. § 595.02(1)(d), the statutory physician-patient privilege. That statute provides that a physician "shall not, without the consent of the patient, be allowed to disclose any information or any opinion based thereon which the professional

1 AMS does not know the availability of these eight urologists. AMS reserves the right to seek to expand beyond the eight if the need should arise.

acquired in attending the patient in a professional capacity, and which was necessary to enable the professional to act in that capacity." The purpose of the statute is to protect all "confidential communications between a patient and his attending physician." *State v. Staat*, 291 Minn. 394, 397, 192 N.W.2d 192, 196 (1971).

Under AMS' proposal, the urologists would appear as experts only in cases not involving their own patients. Thus, they would not be testifying about their own patients' medical histories, and would not be called upon to divulge any confidential communications with their own patients which are protected by the physician-patient privilege. Accordingly, Minn. Stat. Ann. § 595.02(1)(d) is inapplicable here.

Nor would AMS' retention of these urologists violate Minn. R. Civ. P. 35.04. Rule 35.04 addresses the issue of discovery of a "*treating or examining*" physician in a case involving his own patient's "physical, mental or blood condition." (Emphasis added.) Rule 35.04 does not purport to address whether a physician is barred from testifying as an expert where he is not the "*treating or examining*" physician, or where the case does involve the "physical, mental or blood" condition of his own patient. Because none of the urologists AMS intends to retain as experts are treating physicians for any of the 20 plaintiffs selected for full discovery, the matters that the urologists would be consulted about do not relate to the 20 plaintiffs' "physician, mental, or blood condition." Thus, Rule 35.04, like Minnesota's patient-physician privilege, does not prohibit AMS from retaining these urologists.

AMS represents that it will not discuss, with any of its expert urologists, the medical condition or treatment of any of their patients who are plaintiffs in Minnesota. Instead, AMS intends to have the urologists testify as experts about their general knowledge and experience with penile prostheses and the medical issues relating to the 20 plaintiffs selected for full discovery, none of whom are their patients. These issues include the debilitating effects of impotence on patients' lives; the benefits of penile prostheses in restoring sexual function; the unavailability of alternative treatments at the time of plaintiffs' implantation surgeries; the

reliability of AMS penile prostheses; and the accuracy of AMS' disclosures to the urological community of the risks and benefits associated with penile prostheses. Johnson Aff. ¶ 5.

Previously, plaintiffs have relied upon *Wenninger v. Muesing*, 240 N.W.2d 333 (Minn. 1976), but that case has nothing to do with the retention of experts. *Wenninger* held that defense counsel could not conduct ex parte interviews with "plaintiff's attending physicians" about "privileged medical testimony" regarding their own patients. *Id.* at 334, 336. Moreover, because the experts retained by AMS would not include any of the "attending" physicians for the 20 selected plaintiffs, unlike the case in *Wenninger* they would not be discussing with AMS any "privileged" information regarding the medical condition or treatment of their patients.

As previously stated, each plaintiff's case filed in Minnesota is a separate case. No rule prevents a party from retaining a physician as an expert in one case simply because *another* one of his patients has *another* lawsuit pending.

In sum, no rule of privilege would be implicated by AMS' proposal. Accordingly, AMS has the right to retain the urologists as experts in any case not involving their own patients.

## CONCLUSION

For all of the reasons set forth above, AMS' motion for a declaratory ruling affirming its right to retain the eight urologists it has previously used and who are not treating physicians for any of the 20 plaintiffs selected for full discovery should be granted.

Dated: April 21, 1998

Respectfully Submitted,

OPPENHEIMER WOLFF & DONNELLY

By: ______________________
William P. Studer, # 106781
David P. Graham, # 185462
3400 Plaza VII Building
45 South Seventh Street
Minneapolis, Minnesota 55402
(612) 607-7000

ATTORNEYS FOR DEFENDANT
AMERICAN MEDICAL SYSTEMS, INC.

Steven Glickstein
Sheila S. Boston
KAYE, SCHOLER, FIERMAN,
HAYS & HANDLER, LLP
425 Park Avenue
New York, New York 10022
(212) 836-8000